### SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

**Christos NETELKOS, a/k/a Christopher J. Nickos, Arno Arndt a/k/a Ernst Arndt, Charles Haig Gamarekian a/k/a Charles Haig, Falcon Sciences, Inc., Paul F. Donnelly, Trust and Investment, A.G., Robert I. Goodman, Defendants.**

**No. 84 Civ. 0335 (SWK).**

United States District Court, S.D. New York.

Aug. 3, 1984.

Anne C. Flannery, Associate Adm'r of New York Regional Office, New York City, for plaintiff S.E.C.; Margaret M. McQueeney, Seth T. Taube, Arthur G. Jakoby, New York City, of counsel.

Spengler, Carlson, Gubar, Brodsky & Frischling, New York City, for defendant Christos Netelkos; Thomas H. Sear, Emily J. Spitzer, New York City, of counsel.

Mahoney, Mahoney & Cannon, Westfield, N.J., for defendant Charles H. Gamarekian; Anthony M. Mahoney, Westfield, N.J., of counsel.

## OPINION AND ORDER

KRAM, District Judge.

This matter is before the Court on the application of the Securities and Exchange Commission ("SEC") for preliminary injunctions, pursuant to 15 U.S.C. §§ 77t(b), 78u(d) and 78u(e), against Christos Netelkos, a/k/a Christopher J. Nickos, Charles Haig Gamarekian a/k/a Charles Haig, Arno Arndt a/k/a Ernst Arndt, and Trust and Investment, A.G., barring violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. The Court initially granted a temporary restraining order as to the defendants. Subsequently, extensive hearings were held at which substantial amounts of evidence were adduced by the SEC. Defendants Arndt and Trust and Investment, A.G., did not appear, although it appears that they were properly served in Switzerland pursuant to Rule 4 of the Federal Rules of Civil Procedure. The application for a preliminary injunction against defendants Arndt and Trust and Investment, A.G., will be dealt with in a separate opinion. The other two defendants, Netelkos and Gamarekian, appeared, but limited their presentation to cross-examination of the SEC's witnesses, and presented only three witnesses of their own. When the SEC attempted to call defendants Netelkos and Gamarekian to testify, both refused, invoking their Fifth Amendment privilege.

The SEC in its complaint alleges that defendants Netelkos and Gamarekian violated a veritable laundry list of securities laws and regulations, and seeks preliminary and permanent injunctions against both. Specifically, the allegations are:

that these defendants, along with others, have violated, are violating and will violate restrictions on selling, buying, offering or delivering unregistered securities, sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and (c);

that these defendants, along with others, violated, are violating and will violate the anti-fraud provisions, section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78l(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder;

that these defendants, along with others, have aided and abetted, are aiding and abetting and will aid and abet, Falcon Sciences, Inc. in violating registration and reporting requirements, sections 12(g) and 13(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78l(g) and 78m(a), and Rules 12b–20, 13a–11 and 13a–13, 17 C.F.R. §§ 240.12b–20, 240.13a–11 and 240.13a–13 promulgated thereunder; and

that defendant Gamarekian, along with another person, has aided and abetted, is aiding and abetting and will aid and abet Falcon Sciences, Inc., in violating the transfer agent provisions of sections 17A(c) and 17A(d) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78q-1(c) and 78q-1(d), and Rules 17Ad-4, 17Ad-6 and 17Ad-7, 17 C.F.R. §§ 240.-17Ad-4, 240.17Ad-6 and 240.17Ad-7, promulgated thereunder.

The SEC is empowered by section 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t(b), and sections 21(d) and 21(e) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78u(d) and 78u(e), in its discretion and "whenever it shall appear ... that any person is engaged or is about to engage in acts constituting a violation of any provision of (these) title(s) ..." to "bring an action in the proper district court of the United States ... to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond."

■ Before a preliminary injunction can issue, the SEC must demonstrate (a) a "strong *prima facie* case" of previous violations, and (b) "a reasonable likelihood that the wrong will be repeated." *Securities and Exchange Commission v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir.1975); *Securities and Exchange Commission v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir.1972); *Securities and Exchange Commission v. Boren*, 283 F.2d 312, 313 (2d Cir.1960).

This Court has jurisdiction over such suits pursuant to section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a), and sections 21(e) and 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78u(e) and 78aa.

Venue is found in this court based on the fact that various of the acts which are alleged to constitute violations of the Securities Act of 1933 and the Securities Ex-

change Act of 1934 occurred and are occurring within the Southern District of New York. 28 U.S.C. § 1391.

In addition, the SEC seeks other relief in the form of a continued freeze on the assets of the defendants, with significant restrictions on the use of those assets, pursuant to the general equitable powers of the Court. The SEC also seeks a contempt citation against defendant Netelkos for alleged violations of the Court's previously entered Freeze Order and limitations on disposition of assets.

Each of the defendants was personally served with the summons and complaint along with the Order to Show Cause and the Temporary Restraining Order. As noted above, only two defendants were present at the hearing, although neither testified.[1] I will address the allegations in the complaint in the order in which they appear above.

The gist of the complaint against these defendants is that they, personally and as representatives of Falcon Sciences, Inc. ("Falcon"), another defendant, misrepresented and omitted material facts from disclosure documents filed on behalf of Falcon with the SEC; sold unregistered and unauthorized or counterfeit shares of Falcon; failed to make required filings with the SEC; failed to maintain statutorily required transfer records; destroyed and altered transfer records; fraudulently created transfer records; concealed their role in the operation of Falcon; and siphoned and secreted monies belonging to Falcon. Given the overwhelming amount of credible evidence that the enumerated violations occurred, and the great likelihood that the defendants will violate the federal securities laws in the future if they are not enjoined, the SEC's application is GRANTED, except as noted below.

## BACKGROUND

Falcon Sciences, Inc., is a publicly-held Utah corporation with its principal place of

---

1. With the exception of Falcon, all the other defendants consented to entry of preliminary injunctions. Falcon initially consented to entry of an injunction and then withdrew its consent. A subsequent hearing was held and a determination on that hearing will follow shortly.

business in Colt's Neck, New Jersey. Falcon's primary business is the development and marketing of enhanced oil recovery ("EOR") technology. Enhanced oil recovery technology is used to increase the amount of crude oil recoverable from an oil well. It is used primarily after the oil well has stopped flowing or producing on its own. Typically, EOR involves pumping water or chemicals under high pressure or high temperature into the well. The water or chemicals loosen the remaining oil from the oil-bearing substrate and displace it, causing the oil to move from the well to the well head, and thereafter to pipeline or wherever the well operator directs it. Obviously, this technology allows the well operator to recover previously unrecoverable oil, which can then be refined or sold. Much EOR development occurred after the Arab oil embargo of 1973, as the world market price of oil increased dramatically. These price increases made justifiable the use of expensive technology to recover oil which had previously been unprofitable.

Falcon was founded in 1977 as Falcon Enterprises, Inc., also a Utah Corporation. SEC Exhibit ("Exh.") 100, p. 4. The name of the corporation was changed in 1982. Exh. 100, p. 4. Thereafter, the company apparently acquired the assets of Reliance Oil and Gas Co. for $250,000 cash and the assumption of liabilities; acquired the assets of the Oil & Gas Capital Fund, Inc., for 1,847,500 shares of Falcon Common stock; acquired the assets of the Mentron Corporation for 3 million shares of Falcon common stock; and, "acquired a number of oil and gas leases" in exchange for 500,000 shares of Falcon common stock. Exh. 100, pp. 4–5.

As of March 1, 1983, the following persons or entities were known to Falcon to own in excess of five per cent of any class of Falcon securities: Paul J. Donnelly; Frank Mentone; Samuel Miller; and Frank Campana. Noticeably absent from this list is Robert Goodman, the holder of some two million shares, allegedly in trust. Exh. 100, p. 17. The following persons were identified as the executive officers and directors of Falcon as of that date: Allen M. Rahm (Director, CEO and Pres.); Kevin J. McCrary (Director, Exec. V.P.—Technical Committee); and Paul J. Donnelly (Director, Secretary and Treasurer). Exh. 100, p. 18.

Falcon acquired what appears to be its primary EOR technology by means of a non-exclusive license agreement entered into on April 20, 1982, with P.D. Utah Corporation. This contract called for Falcon to compensate P.D. Utah Corporation with 45 million shares of Falcon common stock. In return for these shares of stock, P.D. Utah Corporation, through its president, Paul Donnelly, apparently waived its rights to the EOR technology developed by an inventor named Christopher J. Nickos, in favor of a license directly to Falcon. Exh. 100, p. 90. It is undisputed that Nickos is in fact defendant Christos Netelkos.[2] As compensation to Netelkos, Falcon obligated itself to pay a royalty of 2½% of the gross revenues derived from the use of the licensed technology. Exh. 100, p. 89. P.D. Utah Corporation subsequently exchanged 40 million of its Falcon shares for 4 million shares of Falcon Class A Common Stock with a par value of one cent ($.01) per share. Exh. 100, p. 4. Paul Donnelly, also a defendant in this action by reason of his holding the office of president of Falcon, is stated to be the sole shareholder of P.D. Utah Corporation. Exh. 100, p. 16.

The evidence introduced at the hearing demonstrated that after the licensing

---

**2.** There was a dispute at the hearing as to whether Netelkos properly used the name 'Nickos'. Feb. 15, 1984, Transcript pp. 92–100. The evidence indicated that Nickos was a name given to Netelkos for his use only while he was in prison and that he was expressly instructed not to use that name following his release. Furthermore, the evidence indicates that the services of the Witness Protection Program of the Department of Justice were offered to Netelkos and that he refused the offer. There was no evidence that any subsequent change of name or identity was offered or was effected by the Department of Justice or any other agency, or by Netelkos himself other than by his assumption of the name. Therefore, I find that Netelkos' name was never legally changed. All reference to him in this opinion will be as Netelkos.

agreement became effective, and possibly before, Netelkos was an active participant in the day-to-day operation of Falcon under the name Christopher J. Nickos. As Nickos, Netelkos had an office at Falcon's Colt's Neck facility, had a secretary there, drafted and mailed correspondence on Falcon stationery for other people's signatures, drafted Falcon contracts, and supervised Falcon field personnel. Donnelly Dep. pp. 53–54. Netelkos also attended virtually every meeting of Falcon's board of directors, despite the fact that he had no official position on the board. Donnelly Dep. p. 54; Hearing Transcript ("Transcript") p. 128. Netelkos also ordered a secretary at Falcon to sign Falcon's president's name to Falcon checks payable to him personally, and for a broad variety of personal expenses. Sciotto Dep. pp. 115–137.

Similarly, Charles Haig Gamarekian, then known to the employees of Falcon and others as Charles Haig, was also an active participant in the daily management of Falcon. Specifically, Gamarekian ran the stock transfer operation for Falcon, which functioned as its own transfer agent after April, 1982. He ordered the person doing the necessary record keeping as to what to enter in the computer used for that purpose. Transcript p. 23. He instructed the same person to destroy cancelled Falcon stock certificates. Transcript p. 26. And he had physical possession of and apparent control over the blank stock certificates. Transcript p. 28. In addition, Gamarekian spent virtually all of his working day at Falcon, contacting broker-dealers to promote sales of Falcon stock. Transcript p. 21; Donnelly Dep. p. 167. His other activities included dealing with at least one chemical supplier on behalf of Falcon, Donnelly Dep. pp. 185–187, and involving himself in field tests of Falcon's EOR device, Donnelly Dep. p. 186.

With respect to the activities of both these individuals while at Falcon, the SEC also introduced an enormous amount of documentary evidence. This evidence included cancelled checks made payable to both, either in the names they used at Falcon, the names of their spouses, or nominee names. Exhs. 1100, 1200. The SEC also introduced a Form 10 (General Form for Registration of Securities) filed by Falcon on April 11, 1983, which fails to mention either Netelkos or Gamarekian. Exh. 100. Nor do various other Falcon press releases and filings with the SEC disclose these associations or the activities of the defendants in Falcon's operations. Exhs. 101–109. These omissions are particularly glaring in light of the fact that Netelkos assisted in the preparation of at least one Falcon financial statement, Donnelly Dep. pp. 30–42, and that Gamarekian assisted in the drafting of a Form 8K for Falcon after he had purportedly left the employ of Falcon, Transcript p. 131. Nor is it revealed in any of the documents introduced by the SEC that Netelkos and Gamarekian controlled Reliance Oil & Gas Corporation ("Reliance"). As noted above, most of the assets of Reliance were acquired by Falcon in transactions in 1982. Notably, testimony at the hearing also revealed much the same pattern of behavior by the defendants at Reliance as was testified to as the norm at Falcon: control without titles; signing, or ordering, checks, contracts and letters signed in other peoples' names; and, a general lack of disclosure. Transcript pp. 218–219; Sciotto Dep. pp. 5–15. Equally notable is the fact that much of this parallel testimony came from different witnesses but concerned the activities of the same two people: Netelkos and Gamarekian.

In a similar vein, other transactions entered into by Falcon were with companies either controlled by Netelkos or in which he played a significant role. Specifically, in 1982, Falcon announced a contract with Hemisphere Energy Resources ("Hemisphere"). Exh. 105. Netelkos controlled Hemisphere by his position there, which was either president or vice-president, depending upon which piece of evidence one believes. *Compare* Exh. 380.3 # 0 *with* Exh. 350, p. 20. There was apparently no claim by Falcon that *this* was an arms-length transaction; however, neither was it disclosed that Netelkos was an officer of

Hemisphere and occupied a position of authority at Falcon. And, although Falcon apparently rescinded this transaction later, the fact remains that disclosure of Netelkos' involvement with Hemisphere was never made.

Finally, both Netelkos and Gamarekian were deposed by the SEC in the course of the investigation. Exhs. 340, 370 and 390. Both Netelkos and Gamarekian invoked their respective Fifth Amendment privileges and refused to answer virtually all the questions put to them. Those questions included inquiries as to the respective defendants' roles in the management and operation of Falcon and various other companies with whom Falcon dealt; the respective defendants' roles and actions in the issuance and transfer of Falcon securities and the preparation and filing of documents required by the Federal securities laws; and, the respective defendants' relationships and dealings with Arno Arndt, and Trust and Investment, A.G., and various companies related to or controlled by those fugitive defendants.

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

### '33 ACT VIOLATIONS

The Securities Act of 1933 and the Securities Exchange Act of 1934, as both have been amended by Congress and extensively interpreted by the SEC, through its rulemaking authority and by the Courts, represent an attempt to coherently and cogently regulate the issuance and trading of securities in the United States. The focus of the two acts is different. The Securities Act of 1933 ("the '33 Act") regulates the issuance of securities. To that end, section 2 of the '33 Act defines a variety of terms, including "security," "issue" "sale" or "sell," "prospectus," "underwriter," and "dealer." Section 6 of the '33 Act states when a registration statement, the required contents of which are delineated in section 7, may be filed. Sections 3 and 4 provide specific exemptions from the general applicability of the '33 Act. Most important, sections 5(a) and 5(c) prohibit "use of any

means or instruments of transportation or communication in interstate commerce or of the mails" by any person to offer, sell or deliver any security *unless* a registration statement is in effect as to that security. In other words, no person may sell or deliver a security using a means of interstate commerce or the mails unless a registration statement has been filed or an exemption is applicable.

As noted above, the exemptions available under the '33 Act are those stated in Sections 3 and 4, 15 U.S.C. §§ 77c and 77d. Section 3 exempts certain specific securities. These securities are: a class of securities "grandfathered" into the '33 Act; securities issued or guaranteed by the federal or state governments, banks, and in other circumstances not relevant here; certain commercial paper with maturities of nine months or less; securities issued by eleemosynary institutions; securities issued by savings and loans and similar institutions; securities issued by carriers subject to the Interstate Commerce Act; certificates issued by bankruptcy trustees; certain insurance policies; securities issued in exchange for other securities of the same issues; securities issued pursuant to governmental approvals; and securities offered and sold within a single state. None of these exemptions applies in this case.

■■■ Section 4, on the other hand, exempts securities transactions when they are made by certain persons. As other courts have frequently noted, it is the transactions which are exempt, not the person. *See, e.g., United States v. Wolfson,* 405 F.2d 779, 782 (2d Cir.1968), *cert. denied,* 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969). In addition, the person claiming an exemption for a given transaction or transactions bears the burden of proving that the exemption applies. *Securities and Exchange Commission v. Ralston Purina Co.,* 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953); *Byrnes v. Faulkner, Dawkins & Sullivan,* 550 F.2d 1303, 1311 (2d Cir.1977); *Securities and Exchange Commission v. Galaxy*

*Foods, Inc.*, 417 F.Supp. 1225, 1242 (S.D.N.Y.), *aff'd without opinion*, 556 F.2d 559 (2d Cir.1976), *cert. denied*, 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977). *Securities and Exchange Commission v. Guild Films Co.*, 279 F.2d 485 (2d Cir.), *cert. denied*, 364 U.S. 819, 81 S.Ct. 52, 5 L.Ed.2d 49 (1960). The exempt transactions under Section 4 are: transactions by a person who is *not* an issuer, underwriter or dealer; transactions by a dealer subject to certain time restrictions not relevant here; unsolicited brokers' transactions executed on an exchange or over-the-counter; and, transactions in certain real estate secured promissory notes, subject to restrictions not relevant here. These exemptions apply generally to securities already issued and do not exempt distributions by issuers or acts of others who engage in steps necessary to such distributions. *Securities and Exchange Commission v. Murphy*, 626 F.2d 633, 648 (9th Cir.1980); *Securities and Exchange Commission v. Culpepper*, 270 F.2d 241, 247 (2d Cir.1959). It is undisputed that no registration pursuant to section 6 of the '33 Act was filed by or on behalf of Falcon. Exhs. 11 and 12.

### 1. The Goodman Transactions

■ The evidence at the hearing, primarily the testimony of Robert Goodman, Esq., showed that Mr. Goodman sold a substantial number of Falcon shares on behalf of Netelkos ("the Goodman transactions") and subsequently remitted to Netelkos most of the proceeds of those sales. Goodman was never the beneficial owner of those shares, although he did retain a portion of the proceeds as compensation for services which he rendered in his capacity as counsel to Netelkos. With respect to these sales, then, the preliminary areas of inquiry are: first, what role did Netelkos play at Falcon; second, given his role at Falcon, were the transactions in question exempt from the requirements of the '33 Act.

### A. Netelkos' Role

The litany of Netelkos' activities at Falcon and his involvement with Falcon through various other companies is set out above. Based on those activities and that involvement, this Court finds that Netelkos was in control of Falcon and was therefore an issuer within the meaning of Section 2(11) of the '33 Act, 15 U.S.C. § 77b(11). Control is a question of fact depending on the totality of the circumstances. Netelkos was in control because he "possessed and exercised the power to direct the management and policies" of Falcon. *Securities and Exchange Commission v. Micro-Moisture Control, Inc.*, 148 F.Supp. 558, 562 (S.D.N.Y.1957), *aff'd sub nom Securities and Exchange Commission v. Culpepper*, 270 F.2d 241 (2d Cir.1959). The Court also notes that Netelkos has been previously enjoined from violations of the securities laws in *Securities and Exchange Commission v. Manor Nursing Centers*, 340 F.Supp. 913 (S.D.N.Y.1981), *Securities and Exchange Commission v. First World Corporation*, 72 Civ. 4496 (S.D.N.Y. March 12, 1972; and *Securities and Exchange Commission v. Coatings Unlimited, Inc.*, 72 Civ. 359 (E.D.N.Y. Nov. 26, 1974); and was criminally convicted of securities laws violations in *United States v. Ira Feinberg*, (S.D.N.Y.1973) and *United States v. Netelkos*, (D.N.J.1975).

Simultaneous with his control of Falcon, Netelkos also controlled Goodman. Netelkos told Goodman to open the brokerage accounts at Investors Associates and Engler & Budd in nominee names. Transcript p. 107. Netelkos gave Goodman 786,000 Falcon shares. Transcript p. 108. Netelkos instructed Goodman to sell those shares for him at specific prices. Transcript pp. 117–119. The proceeds from these sales were then transferred at Netelkos' direction, first to a bank account in a nominee name and then to Netelkos, directly or indirectly, and to various other payees at Netelkos' direction. Transcript pp. 110–122; Exh. 311.

### B. Exemption

As a controlling person within the meaning of section 2(11), Netelkos was barred

from using the mails or any means or instrument of interstate commerce or transportation in selling, offering or delivering any shares of Falcon stock unless there was a registration statement in effect for the shares or an exemption applied either to the shares or the transactions in question. As noted above, it is undisputed that there was no '33 Act registration in effect for these or any other Falcon shares.

In Falcon's 1983 Form 10, reference is made to a series of securities transactions during 1982, as to which Falcon claims exemption from the '33 Act registration requirement under section 4(2), 15 U.S.C. § 77d(2), the private placement exemption. These allegedly exempt transactions applied to issuance of approximately 16,300,-000 shares of Falcon common stock and 4 million shares of Falcon Class A common stock, net of exchanges. The exchange was of 40 million common shares for 4 million Class A common shares; these securities were exempt under Section 3(9), 15 U.S.C. § 77c(9). Aside from these two exemptions, it appears that no other was available or claimed. No Falcon securities were exempt under section 3 except the exchange shares discussed above. Shares in the hands of Netelkos, a controlling person of Falcon, did not change in status with respect to section 3, and therefore were not exempt.

First, as noted above, a person claiming an exemption under section 4 bears the burden of proving its availability. Second, it does not appear from the record that these defendants claim that any exemption applies to the transactions in question here. Finally, notwithstanding the failure of the defendants to either claim or prove an applicable exemption, this Court has carefully considered the statutory exemptions and the applicable SEC Rules and finds that none of them applies to these transactions. With no registration statement filed as to these shares and no exemption available, these two transactions violated the provi-

sions of sections 5(a) and 5(c) of the '33 Act. Netelkos, an issuer, transferred and offered to buy and sell unregistered shares through use of both the mails and by other means of interstate commerce. The use of Goodman as an intermediary is of no consequence in establishing this violation. Rather, Goodman's actions on behalf of an issuer simply meant that Goodman, in turn, was a statutory underwriter pursuant to section 2(11) of the '33 Act.[3]

### 2. Counterfeit Shares

The Goodman transactions lead to the next point in this inquiry: whether those shares, along with certain others discussed below, were unauthorized or counterfeit shares. Even with the assistance of the Final Report of the Special Master, it is impossible to state with certainty the answer to that question. However, the burden of the SEC at this stage of the proceeding is not certainty but a *prima facie* case of violation. Given the extraordinary irregularity of the recordkeeping by Falcon and the transactions in question and the enormous amount of evidence, this Court finds that the SEC has made out a prima facie case that the issuance of these shares was at the very least unauthorized and that the shares were probably counterfeit.

### A. Gamarekian's Role

The details of Gamarekian's activities at Falcon are set forth above. Certain other information deserves explication at this point. As was true of Netelkos, Gamarekian was previously convicted of criminal violations of the federal securities laws in *United States v. Netelkos*, (D.N.J.1975). As was also true of Netelkos, Gamarekian used at least one alias during the time he worked at Falcon. His involvement with Falcon was extensive and included complete control over Falcon's stock transfer operations, management of Falcon's EOR field testing, supply purchases for those

---

**3.** Goodman consented to entry of a final judgment against him, while neither admitting nor denying any violations, and disgorged all proceeds from the stock transactions which he had not yet passed on to Netelkos. Goodman also surrendered the legal fees which he had taken from those proceeds.

tests, and substantially all the contracts between Falcon and the market-makers of Falcon's stock. At a company the size of Falcon, control over this variety of significant work functions constitutes substantial control over the entire corporation.

In light of these circumstances, it is my finding that Gamarekian also "possessed and exercised the power to direct the management and policies" of Falcon. *Securities and Exchange Commission v. Micro-Moisture Control, Inc., supra* at 562. Therefore, I find Gamarekian was also an issuer within the meaning of section 2(11) of the '33 Act, 15 U.S.C. § 77b(11). A consequence of this finding, as noted above in the discussion of Netelkos' role, is that Gamarekian is essentially barred from transacting purchases or sales of any Falcon shares unless a registration statement pursuant to section 6 of the '33 Act, 15 U.S.C. § 77f, is in effect as to the shares in question, or the shares or transactions are otherwise exempt from registration. As discussed above the essence of being an issuer is that there is no transactional exemption applicable to purchases, sales or delivery of such shares by such a person or entity. Section 4(1) of the '33 Act, 15 U.S.C. § 77d(1). Therefore, if Gamarekian conducted transactions and the shares in question were not exempt, those transactions violated the federal securities laws. I find that Gamarekian did engage in such transactions, discussed in detail below, and therefore violated sections 5(a) and 5(c) of the '33 Act.

### B. Falcon's Stock Transfer Records

Falcon's recordkeeping of its stock transfer operations was unorthodox at best and criminally fraudulent at worst. To briefly describe the stock transfer operations, Falcon replaced certificates representing transferred shares by using new certificates numbered sequentially higher than the last-issued certificate. Therefore if a stock certificate came into Falcon after being sold or otherwise transferred, it was replaced with a certificate with a higher number. If the last-issued certificate was 9000, then the next certificate would be 9001, regardless whether this number had any relation to the certificate number on the old certificate. This system is not unusual and has the advantage of making it clear that certificates are issued in chronological order since a variation in numerical order and date is readily apparent. It also usually prevents the issuance of two certificates with the same number since the numbers are always increasing.

However, with respect to certain Falcon stock certificates it appears that rather than issue new certificates with the next higher number, older certificate numbers were used. No reason for this variation was offered by any defendant. In particular, this peculiarity implicates defendant Gamarekian since he had complete control over the stock transfer machinery.

What follows is a description of some examples of the more readily apparent discrepancies between the routine certificate numbering system and the actual certificates which are apparently in the hands of some of the putative shareholders. These are simply the more egregious examples. This Court did not attempt an exhaustive analysis of the certificate numbering system, nor was it compelled to do so in light of the other, overwhelming, evidence of securities laws violations.

Specifically, several Falcon stock certificates allegedly issued to Trust and Investment, A.G., ("Trust & Investment") and at least one other nominee, Food Investment Trading Transport, are numbered significantly out of order. The stock certificates issued to Trust & Investment on May 19, 1982, are numbered 6016, 6017, 6019 and 6020, for 100,000 shares each, a total of 400,000 shares. Exhs. 501a and 505b. Further certificates were issued to Trust & Investment on June 18, 1982. These certificates were numbered 5027, 5028, 5029 and 5030, and were also for 100,000 shares each, for a total of 400,000 shares. Exh. 505b. Third, another Falcon stock certificate, numbered 2062, for 50,000 shares, was issued to Trust & Investment on June 16, 1982. Exh. 501a. These inconsisten-

cies are simply unexplainable. There is no reason for stock certificates issued on one date to bear higher certificate numbers than certificates issued on a later date. Nor was any reasonable explanation for these discrepancies offered by any defendant. Furthermore, the discrepancies are aggravated by the fact that certificates numbered 5027, 5028, 5029 and 5030 also appear on the historical stock transfer record prepared by Atlas Transfer Company. Exhs. 600A, 600B, and 600C. That transfer record, prepared as of May 15, 1982, indicates that the four certificates in question were originally issued to Securities Settlement Corporation on September 18, 1980, were for 100 shares each (not 100,000 shares each) and were cancelled on February 25, 1981. Exh. 600C, p. 253. In addition, with respect to the certificates numbered 6016, 6017, 6019, and 6020, the Atlas historical record indicates that other certificates bearing numbers 5998 and 6057 (that is, issued before and after the four certificates in question) were issued on January 7, 1981 and January 14, 1981 respectively. Exh. 600C, p. 253. Assuming the accuracy of the Atlas historical record, which is uncontroverted, there is simply no way that any of these Falcon stock certificates numbered 6016, 6017, 6019, and 6020, could have been properly issued on the date which appears on their face.

### C. Unauthorized or Counterfeit Shares

The preceding examples are only the tip of the proverbial iceberg; they are by no means the only or even the worst irregularities. Much more damning, and of greater concern to this Court, is the issue of some seven million shares, including those represented by the certificates discussed above, which arrived in various brokerage accounts and are the true focus of this case. Some further background is necessary to understand what transpired.

From early summer, 1982, to early fall, 1983, almost seven million one hundred thousand shares of Falcon common stock were transferred into various street and nominee names from thirteen brokerage accounts. Some three million of these shares were then sold to the general public from the brokerage accounts. Eleven of these accounts were in the name of Trust and Investment, Inc., or Trust and Investment, and were opened at the following brokerage firms: Shearson/American Express; Smith Barney Harris Upham; Merrill Lynch; Kidder Peabody; Paine Webber; Bear Stearns; A.G. Becker; Thomson McKinnon; Donaldson Lufkin & Jenrette (London); Dean Witter; and E.F. Hutton. The other two accounts, discussed *supra*, were in the names of Robert Goodman, Trustee, at Engler & Budd in Denver, and Aubrey Williams, at Investors Associates in New Jersey. There is no record of the origin of the shares of stock which passed through these accounts, or their having been transferred into the names under which they were held at the time of their receipt into the various brokerage accounts. Transcript pp. 532–536.

The defendants argue that it was hypothetically possible that these shares were held either in street names or nominee names prior to the transfer of the shares and certificates to the various Trust and Investment brokerage accounts. They are plainly and simply wrong in this argument. If the shares had been held in a street name or nominee name prior to the transfer to the brokerage accounts and then into the street name, there would be a record of the transfer to Trust and Investment at the point when the transfer was made and the new stock certificates were issued. So, for example, the six hundred thousand shares of Falcon common stock which were received into the Trust and Investment account at Smith Barney, Harris Upham were registered in the Trust and Investment name on May 19, 1982 (200,000 shares) and June 18, 1982 (400,000 shares) (these dates appear on the photocopies of the certificates as the date of issuance). Exh. 505b. There is no record of any transfers *to* Trust and Investment on or about those dates. The SEC did a search of some sixty broker-dealers, as well as all the Falcon Sciences marketmakers, from September,

1983, back to *at least* April, 1982. This investigation failed to uncover a single purchase by Trust and Investment, or any of several possible purchasing agents or nominee purchasers, of a single share of Falcon common stock. Nor were there any brokerage accounts in any of these names. Transcript pp. 442–444. Finally, an examination of the records of the Depository Trust Company failed to reveal any transfers of shares held in their street name, Cede & Co., to Trust and Investment from this period. Transcript pp. 499–503.

The conclusions to be drawn from these essentially undisputed facts are inescapable: these shares did not belong to Trust and Investment, in any name, prior to the issuance of the certificates by Falcon or someone who had access to blank Falcon common stock certificates. Nor did Trust and Investment purchase the shares from any holder of record on or near the dates when the certificates were issued to Trust and Investment. In sum, these shares did not exist prior to the issuance of the stock certificates which were subsequently delivered to Smith Barney. Nor is there any evidence that these shares were properly authorized and issued by Falcon. This same pattern and the same conclusions apply equally to all the shares in question, both those received into the eleven Trust and Investment accounts and those sold by Goodman: they did not exist prior to the date on which the stock certificates were issued and they were not authorized or issued by Falcon. In light of these facts and the logical inferences to be drawn from them, I find that these shares were clearly unauthorized and probably counterfeit.

Next is the matter of transactions conducted in these shares. The stock certificates obviously came from a source who had access to a quantity of blank Falcon common stock certificates and the machinery required to issue them to Trust and Investment. As set forth above, Gamarekian had complete control over the Falcon stock transfer operations. He is logically the only person who could have effected the issuance of these certificates. In addition, one of the clerical workers at Falcon

testified that a list of names, which included most of those whose names appeared on, or in conjunction with, the unauthorized or counterfeit certificates, was in Gamarekian's handwriting. Transcript pp. 30–31; Exh. 401. It is my finding that Gamarekian was the person who promulgated these stock certificates, at the direction of Netelkos. This finding is based on the discussion of the certificates, *supra*, and the discussion of Netelkos' contacts with Trust and Investment, *infra*.

■ In addition, the adverse inferences I draw from Netelkos' and Gamarekian's invocation of the Fifth Amendment add credence to this conclusion. The Court notes that there is more than adequate evidence to support its finding that these defendants committed all the alleged violations of the federal securities laws without addition of the adverse inferences which the court draws from the defendants' invocation of their Fifth Amendment privilege. My decision is not based on these adverse inferences. However, the Court is fully justified in drawing such an inference in a civil case. *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1975); *Securities and Exchange Commission v. Scott*, 565 F.Supp. 1513, 1533–1534 (S.D.N.Y.1983). Such an adverse inference "provides further support for the conclusion that [they] violated the securities law." *Scott, supra* at 1534.

Specifically, with respect to Gamarekian's invocation of the privilege as to questions put to him by the SEC concerning the following, I draw an inference adverse to him: his exercise of authority at Falcon; his compensation from Falcon; his supervision of stock transfer operations at Falcon; whether he issued or caused to be issued stock certificates in the names of Trust & Investment, A.G., Food Investment Trading Transport, Food Investment Transport Trading, Zeus Reinsurance Services Limited, Jason Plone, Aubrey Williams, and Kevin Scahergood; and his mailing or causing to be mailed Falcon stock certificates in

any of those names to any New York brokerage firms. Exh. 390 at pp. 34–46.

These same facts lead me to conclude that Gamarekian and Netelkos were also responsible for sending the falsely promulgated stock certificates to the eleven brokerage accounts opened in the name of Trust & Investment, discussed above. Whether Gamarekian sent the certificates directly to the brokerage firms for crediting to the Trust & Investment accounts or were then sent on a more circuitous route is irrelevant. As the person responsible for the promulgation of the certificates, and in control of Falcon's stock transfer operation, Gamarekian was absolutely essential to the distribution of the false certificates. As such, he was a "necessary participant" in that distribution, and his activities were a "substantial factor."

Moreover, it was clear from the evidence introduced at the hearing that Gamarekian acted primarily at the direction of Netelkos. Consequently, Netelkos was also a necessary participant and his activities were a substantial factor. *See, e.g., Securities and Exchange Commission v. Holschuh,* 694 F.2d 130, 139 (7th Cir.1982). Consequently, both are chargeable for their roles in the delivery and sale of these securities. Again, there is no claim that the shares were registered pursuant to section 6 or exempt under either section 3 or 4. Therefore the deliveries and sales were violations of sections 5(a) and (c) by Gamarekian.

As to Netelkos, there was additional evidence of his involvement in the distribution of the Trust & Investment shares in the form of a letter mailed from the United States to defendant Arndt in Switzerland. Exh. 310g. That letter directed the deposit of certain "referenced securities" to brokerage accounts and their subsequent transfer to street name. The date of the letter, July 15, 1982, and the cryptic instructions appear, on weighing all the evidence, to refer to the unregistered Trust and Investment shares.

Other evidence indicates that Netelkos received enormous sums of money from Trust & Investment through Sanction Corporation, which he controlled and continues to control. This money, the SEC argues, was primarily the proceeds from Trust & Investment's sales of the Falcon stock. The connection between Netelkos and Trust & Investment is further demonstrated by the relatively frequent telephone contact between Netelkos in New Jersey and Trust & Investment in Switzerland. Exhs. 700A; 701A; 700B; 701B; 700D; 701D; Tr. pp. 227–33. These telephone calls were made from telephones listed in various Netelkos aliases or nominee names, or other telephones to which Netelkos had access and which were billed to Falcon.

Finally, in response to a series of questions put to Netelkos by the SEC at their deposition of him, Netelkos invoked the Fifth Amendment and refused to answer. These questions inquired as to whether Netelkos delivered, or caused to be delivered, to Arno Arndt any Falcon stock, and whether Netelkos had any beneficial interest in Falcon stock, either delivered by Arndt to various brokerage firms for the account of Trust & Investment, or held in the name of Food Investment and Zeus Reinsurance. Exh. 370, pp. 9–10. I draw an inference adverse to Netelkos from these invocations of the Fifth Amendment, although again it is ancillary to my holding of violations by Netelkos given the weight of the other evidence. Based on that other evidence, I find that the SEC has made a prima facie showing that Netelkos was an issuer of the unregistered Trust & Investment shares, and that no exemption applied to his actions in issuing them. Netelkos was therefore also in violation of sections 5(a) and 5(c) with respect to those shares.

In sum, the SEC has made out its prima facie case that these two defendants violated sections 5(a) and 5(c) of the Securities Act of 1933. In light of the variety of these violations, the efforts to which the defendants went to conceal them and the background of prior criminal and civil violations of defendants Netelkos, Gamarekian, discussed above, and Arndt, I also find the

likelihood of future violations to be very great.

## '34 ACT VIOLATIONS

The motion for a preliminary injunction also alleges violations of sections 10(b), 12(g), 13(a), 17A(c) and 17A(d) of the '34 Act, and various of the rules promulgated thereunder. As noted above, section 10(b) and Rule 10b–5 are the anti-fraud provisions of the '34 Act; sections 12(g) and 13(a), and Rules 12b–20, 13a–11 and 13a–13, are the registration and reporting provisions; and sections 17A(c) and 17A(d), and Rules 17Ad–4, 17Ad–6, and 17Ad–7, are the transfer agent provisions. These allegations will be dealt with in that order.

The '34 Act regulates the purchase and sale of securities. To that end, its various sections attempt to provide a fair marketplace and eliminate or minimize inherent unfair advantages resulting from position or access to information. The '34 Act also imposes recordkeeping and filing requirements to ensure maximum and accurate flow of information. Section 10(b) and Rule 10b–5 have a well-developed history. The elements of an offense under that section are a misstatement or omission of a material fact by an insider acting with the requisite scienter. With respect to the insider status of Netelkos and Gamarekian, the test is whether there existed a relationship between them and the corporation giving them access, directly or indirectly, to information intended to be available only for corporate purpose and not for personal benefit of anyone due to the inherent unfairness involved where a party takes advantage of such information knowing it to be unavailable to those with whom he is dealing. *Securities and Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir.), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968). That is clearly the case with respect to Netelkos and Gamarekian. As discussed above, each was a controlling person of Falcon. They both had direct access to information which was intended solely for corporate purposes, discussed *supra*. This information was also clearly not intended for any individual's personal benefit. Netelkos and Gamarekian were clearly insiders for purposes of section 10(b) and Rule 10b–5.

Having held that Netelkos and Gamarekian were insiders, it is equally clear that they had a duty to disclose any material non-public information which they possessed before they bought or sold Falcon securities, or to refrain from trading altogether. *Schoenbaum v. Firstbook*, 405 F.2d 215 (2d Cir.), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1968). Given insider status and the duty to disclose or refrain from trading, the inquiry now turns to whether Netelkos and Gamarekian possessed material information which they failed to disclose while engaging in transactions in Falcon securities.

The Securities and Exchange Commission demonstrated by a significant preponderance of the credible evidence introduced at the hearing that both of these elements existed. Neither defendant disclosed anything about their respective prior securities law violations, their criminal records, or the fact that both occupied positions of significant control over every important part of Falcon. Also undisclosed were the facts that neither of the defendants was using his real name, that the source of some of Falcon's income was from two filling stations, that other income came from circuitous sales of questionable Falcon stock by Netelkos through Sanction Corporation, that both Netelkos and Gamarekian were substantially involved in drafting documents filed with the SEC, and that Falcon's acquisition of Reliance Oil and Gas Corporation ("Reliance") was necessarily not an arms-length transaction since Netelkos and Gamarekian controlled Reliance. Exhs. 385, 380.3 at pp. 5–15; Exh. 350 at p. 12; Transcript pp. 21, 218 and 219.

These failures to disclose are material within the meaning of section 10(b) and Rule 10b–5 if they would have been important to a reasonable investor in his decision to buy, sell or hold a security. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438,

449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Hoffman v. Estabrook & Co.*, 587 F.2d 509, 517 (1st Cir.1978). *Securities and Exchange Commission v. Bausch & Lomb, Inc.*, 565 F.2d 8, 15 (2d Cir.1977). I find that the facts enumerated above were material. Consequently, the failure to disclose material information was a violation if the defendants were trading and acted with scienter.

In light of my discussion above of the various Falcon shares which Netelkos and Gamarekian issued without authorization, there is no question that they were trading. Furthermore, neither defendant disclosed the fact that the shares in question in both sets of transactions were either unauthorized or counterfeit and were, in any event, unregistered and not exempt from registration. These are material facts in that a reasonable investor would consider them in arriving at an investment decision. As demonstrated above, Netelkos and Gamarekian were obligated to make disclosure of these facts. Both are therefore chargeable with the failure to disclose and, having failed to disclose, were in violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, if they acted with scienter.

■ Finally, with respect to scienter, the SEC must demonstrate a "mental state embracing intent to deceive, manipulate or defraud," or "knowing or intentional misconduct." *Aaron v. Securities and Exchange Commission*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980); *Ernst and Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Once again, the overwhelming evidence adduced at the hearing support my holding that Netelkos and Gamarekian were possessed of the requisite scienter. Specifically, the concealment of their true identities, their respective backgrounds, and the nature of the transactions in question are strongly indicative of an intent to deceive, manipulate or defraud. Because these fraudulent acts were directly related to the offer and sale of Falcon securities, both Netelkos and Gamarekian were plainly in violation of section 10(b) and Rule 10b–5.

Furthermore, these violations of section 10(b) of the '34 Act also constitute violations of section 17(a) of the '33 Act, 15 U.S.C. § 77q(a). Section 17(a) prohibits the identical conduct as does section 10(b), although the fraud under section 17(a) must be more closely linked to the offer or sale of securities than is required under section 10(b). *Kogan v. National Bank of North America*, 402 F.Supp. 359 (E.D.N.Y.1975); *Jackson v. Oppenheim*, 411 F.Supp. 659 (S.D.N.Y.1974), *aff'd in part, rev'd in part*, 533 F.2d 826 (2d Cir.1976). Given my holding above with respect to the defendants' violations of section 10(b) and Rule 10b–5, I further find that Netelkos and Gamarekian also violated section 17(a) of the '33 Act in failing to make the disclosures of material fact and misstating material facts, as discussed above.

Turning to the allegations of violations of the '34 Act registration and reporting requirements, section 12(g) requires registration by "every issuer which is engaged in interstate commerce, or in a business affecting interstate commerce, or whose securities are traded by use of the mails or any means of instrumentality of interstate commerce," within a time period specified in the section. There are several exemptions in section 12(g)(2) to this bright-line requirement, none of which is applicable here. Section 13(a) requires that any issuer required to register pursuant to section 12 also file certain regular reports as prescribed by the statute or by the SEC.

My holding above that Netelkos and Gamarekian issued and traded unauthorized and possibly counterfeit shares logically precludes the filing by them or Falcon of a registration statement for those shares. Although a registration statement pursuant to section 12(g) was filed by Falcon with respect to certain of its securities, this registration is clearly inapplicable to Falcon shares issued by parties other than Falcon, in this case Netelkos and Gamarekian. Furthermore, even assuming Falcon did issue the shares in question, there is no

documentation which supports a finding that they were registered. To the contrary, all evidence indicates no registration for the shares. As controlling persons of Falcon, Netelkos and Gamarekian are liable under section 20(a) of the '34 Act for Falcon's violation, unless they can demonstrate that they acted in good faith. They neither attempted such a defense, nor, in my opinion, could they have succeeded if they had tried. Therefore, it is my holding that Netelkos and Gamarekian violated sections 12(g) of the Exchange Act either by aiding and abetting the exchange of unregistered Falcon shares, or as controlling persons, pursuant to section 20(a).

As a corollary to the violation of the registration requirements of the '34 Act, it is equally clear that the defendants aided and abetted Falcon's failure to make the filings of reporting documents required by section 13(a). Section 13(a) requires that

> every issuer of a security registered pursuant to section 12 of this title shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security—such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 12 (and) ... such annual reports (and copies thereof) ... as the Commission may prescribe.

Rules 13a–11 and 13a–13 require periodic filings by issuers. As demonstrated by the SEC at the hearing, no filings were made with respect to the unregistered shares Falcon made few filings. Exhs. 11, 12, 101–104, and 109. As insiders and controlling persons, Netelkos and Gamarekian are chargeable as principals to these violations of the '34 Act. 15 U.S.C. § 78t(a). Therefore, it is my holding that Netelkos and Gamarekian also violated section 13(a) of the '34 Act.

With respect to Sections 17A(c) and 17A(d) of the '34 Act, these provisions govern the transfer agent functions necessary to facilitate the purchase and sale of securities. Section 17A(c) prohibits "directly or indirectly" the "use of the mails or any means or instrumentality of interstate commerce to perform the function of a transfer agent with respect to any security registered under section 12 of this title," unless the transfer agent has first registered as such with the SEC. Section 17A(d) places regulation of transfer agents under the auspices of the SEC. Rules 17Ad–6 and 17Ad–7 require that transfer agents maintain various records. It was demonstrated beyond dispute by the SEC that Falcon, admittedly acting as its own transfer agent, had not registered as such and kept none of the required records. Exh. 10. As a controlling person within the meaning of section 20(a), Gamarekian is fully liable for this violation. Therefore, it is my holding that defendant Gamarekian violated sections 17A(c) and 17A(d) of the Securities Exchange Act of 1934.

## CONCLUSION

Based on the discussion above, I hold that the SEC has more than made out its prima facie case of the alleged violations. In addition, based on the background of these defendants, in particular their history of securities law violations and previous convictions and injunctions, and the complete lack of cooperation by the defendants in the investigation as well as the flimsy case presented by them during the hearing, I find there is grave likelihood that the defendants will continue to violate the securities laws in the future. *Securities and Exchange Commission v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 98–100 (2d Cir.1978), citing *Securities and Exchange Commission v. Universal Major Industries Corp.,* 546 F.2d 1044, 1048 (2d Cir.1976); *Securities and Exchange Commission v. Bausch & Lomb, Inc.,* 565 F.2d 8 (2d Cir.1976). Therefore, they are *PRELIMINARILY ENJOINED* from violating any of the securities laws, specifically including but not limited to sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C.

§§ 77e(a) and 77e(c); and sections 10(b), 17A(c) and 17A(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), 78q–1(c) and 78q–1(d).

The final issue before this Court is the SEC's application for further relief in the nature of a contempt citation holding Netelkos in contempt of my earlier freeze order, and a modified freeze order reducing the amount of assets available to Netelkos. At this time, the Court will reserve decision on the contempt citation pending the current motion by the SEC and a hearing thereon. However, the modified freeze order is amply justified given the implications of my holdings above and the continued nature of Netelkos' financial dealing, as indicated by his attorney's description of his need for funds. Therefore, it is further

ORDERED that all Mr. Netelkos' assets are hereby FROZEN except that he may withdraw $100 per day unless the court otherwise orders on three days request to the Court with Notice to the Securities and Exchange Commission.

SO ORDERED.