**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**SOFTPOINT, INC., Robert H. Cosby, Ronald G. Stoecklein, Remington Publications, Inc., and John W. Lane, Defendants.**

**No. 95 Civ. 2951(SS).**

United States District Court, S.D. New York.

March 20, 1997.

For the reasons discussed below, both motions are granted.

## BACKGROUND

United States Securities & Exchange Commission, Northeast Regional Office, New York City, Alexander M. Vasilescu, Jacqueline Abramson Zucker, for Plaintiff.

Wayne P. Jordan, New York City, for Defendant Ronald G. Stoecklein.

### OPINION AND ORDER

SOTOMAYOR, District Judge.

Plaintiff, Securities & Exchange Commission ("SEC"), alleges, *inter alia*, that defendant Ronald G. Stoecklein ("Stoecklein") participated in the sale of unregistered common stock of Softpoint, Inc. ("Softpoint"), thereby violating the securities registration provisions of Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a) and 77e(c). Plaintiff further claims that Stoecklein deceived public investors as to the true financial status of Softpoint in violation of the anti-fraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Plaintiff also maintains that Stoecklein falsified accounting records, thereby violating Rule 13b2–1, 17 C.F.R. § 240.13b2–1.

Plaintiff now moves for an order precluding Stoecklein from introducing evidence, denials, and defenses that he previously withheld by invoking his Fifth Amendment privilege during deposition. Plaintiff further moves for summary judgment, pursuant to Fed.R.Civ.P. 56, and requests that the Court permanently enjoin Stoecklein from future violations of the securities laws, bar him from future service as a director or officer of a public company, and order him to pay disgorgement, prejudgment interest, and civil penalties.

Between 1992 and 1995, Stoecklein participated in a series of securities transactions and related activities to raise capital for Softpoint,[1] a publicly-held Nevada corporation that markets a computerized cash register with proprietary software. During the relevant period, Softpoint common stock was traded on the over-the-counter market and on the Boston Stock Exchange. (1993 Form 10–K at 8 (Zucker Aft. Supp. Summ. J. of 5/15/96 (hereinafter "Zucker Aff.") Ex. 14.)) Softpoint is required to file annual and quarterly reports with the SEC, pursuant 15 U.S.C. § 78m and the rules promulgated thereunder.

The stock transactions and related activities began unfolding in 1992, while Stoecklein was a consultant to Softpoint. They continued after he became the president, chief operating officer, and a director of Softpoint in March and April 1994. Stoecklein remained a director and officer of Softpoint until his forced resignation in June 1995.

Stoecklein was a seasoned businessman when he began working for Softpoint in 1991. He had served as an officer and director of several public corporations, securities firms, and an investment banking company, where he gained expertise in structuring and filing securities registration statements and other SEC reports. (1994 Form 10–K at 29–30 (Zucker Aff.Ex. 10); Softpoint Mgt. Profile (Zucker Aff.Ex. 12 at nos. 315–17.)) Stoecklein was also president of a company that he formed to analyze the finances of corporate clients and help them raise capital. (*Id.*) He continued to hold directorships in other public companies while working for Softpoint. (1994 Form 10–K at 29.) The SEC maintains, without denial by Stoecklein, that Stoecklein currently serves as an officer and director of C.E.C. Industries Corp., a public company that attempted to merge with Softpoint during the period covered by this litiga-

---

1. A Consent Judgment was entered against Softpoint in this action on July 25, 1995, permanently enjoining Softpoint from violating the registration, anti-fraud, and record-keeping provisions of the securities laws, and ordering Softpoint to bring its previous financial statements into compliance with the securities laws and Generally Accepted Accounting Principles.

tion. (Statement of SEC counsel (Oral Ar. Tr. of 10/11/96 (hereinafter "Hr'g Tr.")); Pl. Summ. J. Mem. of 5/17/96 (hereinafter "Pl. 1st Sum. J. Mem.") at 23.)

As a consultant to Softpoint, Stoecklein held the title of Director of Administration. (Softpoint Mgt. Profile at no. 315.) He facilitated stock sales, prepared public filings and press releases, participated in business and marketing planning, and disseminated information to investors. (Stoecklein Inv. Interview Tr. of 5/12/94 (hereinafter "Inv. Tr.") at 27 (Zucker Aff.Ex. 3.))

Softpoint paid Stoecklein $71,100 in 1993 and $86,072 in 1994. (Forms 1099–Misc. (Vasilescu Aff.Supp.Summ. J. of 8/23/96 (hereinafter "Vasilescu 2d Aff.") Ex. 12.) Stoecklein also was compensated with 70,000 shares of Softpoint stock, which he sold for $282,416, through his company, co-defendant Remington Publications, Inc. ("Remington").[2] (Pl. Rule 3(g) Statement of Undisputed Facts (hereinafter "Pl. 3(g) Statement") ¶¶ 311–324.) In addition, Stoecklein and Remington received $192,000 from the sale of Softpoint common stock that had been issued to co-defendant John Lane ("Lane").[3] (Zucker Disgorgement & Penalties Decl. of 4/22/96 (hereinafter "Zucker Decl.") ¶ 22.)

## I. Sale of Unregistered Stock And Fictitious Software Sales

In fiscal years 1992 and 1993,[4] Stoecklein participated in a series of transactions and related activities to sell unregistered Softpoint common stock in the United States and disguise the proceeds as earnings from the sale of Softpoint products. First, Softpoint invented fictitious sales of $4.41 million worth of software to six foreign distributors: Aston

Pacific, Ltd. ("Aston Pacific") in Hong Kong, United Excel, Ltd. ("United Excel") in England, Europoint International ("Europoint") in Switzerland, Brantford (Jersey), Ltd. ("Brantford") in China, Canadyne Software Services ("Canadyne") in Canada, and Grupo E.A. ("Grupo") in Mexico. (Pl.3(g) Statement ¶¶ 23, 48.) Softpoint recorded the artificial sales as accounts receivable.[5] (1993, 1992 Forms 10–K (Zucker Aff. Exs. 21, 14); Pl. 3(g) Statement ¶¶ 266–67, 278–79.) Those fictitious receivables accounted for 78 percent of Softpoint's reported total sales of $5.61 million in fiscal years 1992 and 1993. (Pl.3(g) Statement ¶¶ 49–52.)

Stoecklein helped register the sales in Softpoint's quarterly and annual reports, filed with the SEC on Forms 10–Q and 10–K, and in a Form S–4 registration statement (collectively the "public filings") filed pursuant to a proposed merger with C.E.C. Industries Corp. (Inv. Tr. at 34–40, 184–85.) Stoecklein also publicized the sales in press releases. (Inv. Tr. at 27–29.) By portraying the fictitious sales as *bona fide* credit transactions, Softpoint's public filings and press releases misrepresented the nature of Softpoint's dealings with the foreign distributors and overstated Softpoint's 1992 and 1993 sales revenues by a total of 368 percent. (Tax Acc'ts Dep. at 110, 113–19, 122–23, 166, 171–72 (Zucker Aff.Ex. 6.); 1992 Form 10–K at 11 (Zucker Aff.Ex. 21); 1993 Form 10–K at 11 (Zucker Aff.Ex. 14.))

During the same period, Softpoint issued 460,000 shares[6] of unregistered common stock to four of the foreign distributors— Aston Pacific, United Excel, Europoint, and Brantford—as consideration for undefined services pursuant to marketing agreements. (Stock Certificates (Zucker Aff. Exs. 19, 23,

---

2. A final Default Judgment was entered against Remington in this case on June 11, 1996, ordering disgorgement of $282,416 earned from the sale of Softpoint stock and assessing civil penalties in the amount of $847,248.

 The state of Nevada revoked Remington's corporate charter on November 1, 1992. (Revocation Certificate (Zucker Aff.Ex. 112.))

3. A final Default Judgment was entered against Lane in this case on June 11, 1996, ordering him to disgorge $1,010,712 that he received from the sale of Softpoint stock and to pay civil penalties in the amount of $100,000.

4. Softpoint's fiscal year ran from September 1 to August 31.

5. One of the distributors, Grupo, did not yet exist at the time of the ledger entry. (Pl.3(g) Statement ¶ 94.)

6. Although the Complaint alleges that Softpoint transferred 420,000 shares of its stock to the overseas distributors, subsequent SEC filings place the number of shares at 460,000.

29, 31, 33); Marketing Agreements (Zucker Aff. Exs. 27, 35–37.)) Stoecklein helped Softpoint's then president Robert Cosby ("Cosby")[7] prepare the marketing agreements and was familiar with their terms. (Inv. Tr. at 48–54, 58–60, 71, 87, 97–98, 101–02.) Stoecklein claimed, however, that his knowledge of the contractual arrangements was limited to the information that Cosby gave him to "input" into the marketing agreements. (Inv. Tr. at 48–54, 58–60, 71, 87; Stoecklein Aff. of 8/7/96 (hereinafter "Stoecklein 1st Aff.") ¶ 8.) Stoecklein asserted that Cosby was the only Softpoint official who dealt with foreign distributors. (Stoecklein 1st Aff. at ¶ 8.)

In the third group of transactions and related activities, 344,700 shares of the unregistered common stock issued to the foreign distributors were sold to public investors in the United States for more than $1.7 million. (Pl.3(g) Statement ¶¶ 153, 157, 167, 172, 178.) The bulk of the proceeds, $1.34 million, was remitted to Softpoint and recorded as payments against the fictitious accounts receivable. (Acc'ts Receivable Ledger (Zucker Aff. Ex. 22); Pl. 3(g) Statement ¶¶ 154, 158, 168, 175, 181.) During his prelitigation examination, Stoecklein revealed that Softpoint's plan to liquidate the stock in the United States predated the distribution of the shares to three of the foreign distributors: United Excel, Europoint, and Brantford. (Inv. Tr. at 40–42, 45, 67–69, 91; Pl. 3(g) Statement ¶¶ 27, 33, 39, 44.)

Stoecklein admitted that he "helped to liquidate those blocks of stock" in the United States. (Inv. Tr. at 54–55.) He admitted that he contacted a number of large brokerage firms and arranged their compensation and the terms of the stock sales. (Inv. Tr. at 42–43, 67, 76–77, 91–92.) The firms included Lain Wagner, Inc., L.P. Charles & Goings, Inc., New World Securities, Inc., and Strategic Resource Management, Inc. (Id.) Stoecklein monitored the stock sales and the distribution of the proceeds. (Inv. Tr at 77–79;

faxes to Stoecklein (Zucker Aff. Exs. 63, 64, 87, 90, 91, 95.)) He also arranged to have his brother, Donald Stoecklein ("D.Stoecklein"), open brokerage accounts and sell more than half of the unregistered shares liquidated in the United States.[8] Stoecklein subsequently attempted to recant his admission that he initiated contact with any brokerage firms, but he affirmed that he dealt with the broker-dealers to sell the stock. (Stoecklein 1st Aff. ¶ 19.)

During the stock liquidation, Softpoint remitted $196,000 to the brokerage firms without disclosing the payments to the SEC or to the public. (Pl.3(g) Statement ¶¶ 260, 263, 280, 285, 291.) The SEC labeled the payments as "kickbacks" and alleged that they were directed by Stoecklein. (Pl. 1st. Sum. J. Mem. at 10; Pl. 3(g) Statement ¶¶ 263, 269, 271–72.) Stoecklein knew about the payments and admitted handling communications regarding the funds, but he professed a lack of authority to make the disbursements. (Inv. Tr. at 77–81; Pl. 3(g) Statement ¶¶ 254–255, 257, 262–291; Stoecklein 1st Aff. ¶¶ 32–33.)

Although Stoecklein was aware that proceeds from the stock sales were remitted to Softpoint and used to pay down the accounts receivable, he nonetheless helped portray the stock proceeds as legitimate income in Softpoint's public filings and press releases. (Stoecklein Inv. Tr. at 54–55, 75–76, 86; Press Rels. (Zucker Aff. Ex. 34 at nos. 10026, 10042, 10047.)) Stoecklein subsequently tried to recant his admission that he knew that Softpoint recorded the stock proceeds as payments to accounts receivable. (Stoecklein 1st Aff. ¶¶ 20, 21, 23, 25.)

After Stoecklein became president of Softpoint in 1994, he retained the remainder of the fictitious receivables on Softpoint's books as doubtful accounts, thereby perpetuating the fiction that the software sales had been *bona fide* and that future collection was possible. (Pl.3(g) Statement ¶¶ 242, 244.) Nev-

---

7. A final Default Judgment was signed against Cosby in this action on August 23, 1996, ordering him to disgorge $779,971 and to pay a civil penalty of $100,000.

8. Without admitting or denying the findings, D. Stoecklein consented to an SEC Cease and Desist

Order regarding his role in the Softpoint stock transactions. He was required to disgorge $19,-975. Cease and Desist Order, Securities Act Release No. 33,7207, Exchange Act Release No. 34,36177, 60 S.E.C. Docket 327 (Sept. 1, 1995) (Vasilescu 2d Aff.Ex. 14).

ertheless, Softpoint did not report the fictitious software sales in its federal tax returns for fiscal 1992, 1993, and 1994, all of which were prepared and filed in 1994 and 1995, while Stoecklein was president of Softpoint. (Pl.3(g) Statement ¶¶ 215–223; 1992–94 Tax Returns (Zucker Aff. Exs. 77, 78, 81.)) Stoecklein participated in discussions with Softpoint's auditor Duane Midgley ("Midgley") about the preparation of the 1992 federal tax return, and both the 1992 and 1993 returns were sent to Stoecklein before they were filed with the Internal Revenue Service. (Midgley Dep. at 44–49, 77 (Zucker Aff.Ex. 7.)) Softpoints 1992 and 1993 federal tax returns were inconsistent with the Form 10–Q and Form 10–K statements that Stoecklein had previously helped prepare and file with the SEC, listing the fictitious software sales as legitimate income. (1992, 1993 Tax Returns (Zucker Aff. Exs. 77, 78); 1992, 1993 Forms 10–K (Zucker Aft. Exs. 21, 14.)) Softpoint also included the fictitious accounts receivable in its 1994 Form 10–K statement, and Stoecklein signed both that 10–K statement and the 1994 federal tax return knowing that they were at variance. (1994 Form 10–K (Zucker Aff.Ex. 10); 1994 Tax Return (Zucker Aff. Ex. 81.)).

## I. *Stock Payments For Fictitious Consulting Fees*

In late 1993, Stoecklein participated in additional transactions and related activities to raise capital for Softpoint through the sale of common stock disguised as compensation for consulting services. Softpoint issued 577,000 shares of common stock to co-defendant Lane through his public relations firm, Newhouse & Associates, Inc. ("Newhouse"). (Pl.3(g) Statement ¶ 292.) Softpoint filed two Form S–8 registration statements with the SEC, listing 550,000 shares of that stock as compensation for *bona fide* services not connected with activities to raise capital. (Pl.3(g) Statement ¶¶ 297–298.) Nonetheless, when the stock was subsequently sold through Newhouse's brokerage account, 45% of the proceeds were funneled back to Softpoint and to Stoecklein. Out of the $1.83

million generated by the stock sale, $400,000 was remitted directly to Softpoint; another $226,050 was used to pay advertising and other promotional expenses for Softpoint; and $192,000 was paid to Stoecklein through his company, Remington. (Pl.3(g) Statement ¶¶ 301–304.)

Stoecklein negotiated the stock arrangement with Lane. (Inv. Tr. at 121–22). Stoecklein also helped prepare the Form S–8 registration statements that falsely listed the stock as compensation for services by Lane's company, Newhouse. (Inv. Tr. at 121–22.)

## III. *Unauthorized Issuance of Preferred Stock*

Stoecklein also participated in transactions and related activities to raise money for Softpoint by issuing preferred stock, even though such stock was not authorized by Softpoint's articles of incorporation. In fiscal 1994, Softpoint issued 125,000 shares of preferred stock to purchase prepaid media credits valued at $1.25 million. (1994 10–K at 13, 21–23 nn. 5 & 7.) As president of Softpoint, Stoecklein signed the 1994 10–K statement representing that Softpoint's articles of incorporation had been amended in August 1993 to authorize preferred stock. (1994 Form 10–K at 23.) That representation was false. (Softpoint Art. Incorp. (Zucker Aff.Ex. 111.)) Stoecklein subsequently denied culpability for the misrepresentation, professing unfamiliarity with Softpoint's corporate charter. (Stoecklein 1st Aff. ¶ 38.)

## IV. *Procedural History*

The SEC began investigating Softpoint's activities in 1993. SEC attorneys questioned Stoecklein on May 12, 1994. During that examination, Stoecklein was represented by his brother D. Stoecklein, an attorney.[9]

The SEC commenced this action on March 27, 1995. Pursuant to the Court's scheduling order of September 8, 1995, the SEC sent Stoecklein a notice of deposition, dated January 17, 1996, requiring him to appear for questioning on February 9, 1996, in

---

**9.** D. Stoecklein represented virtually every witness subpoenaed to testify during the SEC investigation that preceded this litigation. (D. Stoeck-

lein Aff. of 8/7/96 (hereinafter "D. Stoecklein Aff.") ¶¶ 2–3 (appended to Stoeckleins 1st Aff.))

Reno, Nevada, near his home. Prior to deposition, Stoecklein consulted with his counsel regarding assertion of the Fifth Amendment privilege. (Stoecklein 1st Aff. ¶ 4.) By letter dated February 1, 1996, defense counsel informed the SEC that Stoecklein could not afford to bring a lawyer to his deposition; however, the letter did not include any mention that Stoecklein would invoke the Fifth Amendment at the deposition. (Letter from Def. Att'y to SEC of 2/1/96 (Vasilescu 2d Aff.Ex. 2.)) Defense counsel contends that he informed the SEC before the deposition that Stoecklein planned to invoke the Fifth Amendment solely because his attorney would be absent. (Hr'g Tr. at 6–7.) Counsel for the SEC, however, disputes the assertion that defense counsel gave advance notice of the true reason for Stoecklein's assertion of privilege. (*Id.*)

During his deposition on February 8–9, 1996, Stoecklein invoked his Fifth Amendment privilege in response to virtually all questions. At the next case management conference, on March 22, 1996, the SEC advised Stoecklein's lawyer that it planned to move for a preclusion order and summary judgment, based, in part, on Stoecklein's assertion of the Fifth Amendment privilege. By letter of April 18, 1996, the SEC warned Stoecklein's counsel that it was preparing motion papers for preclusion and summary judgment. (Letter from SEC to Def. Atty of 4/18/96 (Vasilescu Aff.Supp.Summ. J. of 5/17/96 (hereinafter "Vasilescu 1st Aft.") Ex. 3.)) At the same time, however, the SEC expressed its willingness to halt work on the motions if Stoecklein would waive his Fifth Amendment privilege and sit for deposition. (*Id.*) On April 26, 1996, Stoecklein's counsel responded to the SEC that Stoecklein would not waive his privilege, but would, instead, "take his chances" with a motion for summary judgment. (Letter from SEC to Def. Att'y of 4/27/96 (Vasilescu 1st Aff. Ex. 4.)) The SEC filed its motions for preclusion and summary judgment on May 17, 1996.

By affidavit dated August 7, 1996, Stoecklein informed the Court for the first time that he had invoked the Fifth Amendment at deposition because he could not afford to fly his lawyer to Reno to attend the deposition.

(Stoecklein 1st Aff. ¶ 4.) Stoecklein asserted that he would sit for deposition if he could afford to have his attorney present, but he did not specify the exact circumstances under which he would be willing to submit to examination. (*Id.*) Moreover, during oral argument, defense counsel was unable to tell the Court under what specific conditions Stoecklein would submit to deposition. (Hr'g Tr. at 4–5.)

## DISCUSSION

### I. *Preclusion*

■ Recognizing that assertion of the Fifth Amendment privilege is an effective way to obstruct discovery, the Second Circuit has instructed district courts to "pay particular attention to how and when the privilege was originally invoked" before allowing a defendant to withdraw his claim of privilege. *United States v. Certain Real Property and Premises Known As 4003–4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 84 (2d Cir.1995). Courts must be especially alert to the danger that litigants might invoke the privilege primarily to manipulate discovery or gain an unfair strategic advantage. *Id.* Courts may, in appropriate cases, bar litigants from testifying later about matters previously hidden from discovery through improper invocation of the Fifth Amendment. *Id.* at 87. This is just such a case.

### A. *Improper Assertion of Privilege*

■ Defendant Stoecklein did not invoke the Fifth Amendment to shield himself from compulsion to provide incriminating testimony. Instead, he asserted the privilege to escape the expense of flying his lawyer from New York to Reno, Nevada, to attend his deposition. The Fifth Amendment privilege is not properly invoked when its sole purpose is to force a change of location for a pre-trial examination or to buy time to obtain the presence of counsel. *See Doe v. United States*, 487 U.S. 201, 212, 108 S.Ct. 2341, 2348–49, 101 L.Ed.2d 184 (1988) ("[T]he privilege may be asserted only to resist compelled explicit or implicit disclosures of incriminating information."). Thus, Stoecklein's assertion of privilege was without legal justification, occurring, as it did, for

the express purpose of manipulating the location and timing of his deposition. Such dilatory tactics weigh heavily against Stoecklein's request to submit sworn statements in opposition to the motion for summary judgment.

In addition to his improper invocation of privilege at his deposition, Stoecklein's overall behavior toward the Court and the SEC also militates against allowing him to withdraw his claim of privilege. Not only did Stoecklein conceal the true purpose of his Fifth Amendment assertion, he also manipulated the timing of his attempted waiver and disregarded his obligation to seek assistance from the Court. Courts have broad discretion to control the time and place of discovery; thus, when faced with a dilemma over the location of his deposition, Stoecklein's proper recourse was to the Court, not to a claim of privilege. *See* Fed.R.Civ.P. 26(c)(2). Stoecklein, however, did not notify the Court of any financial hardship caused by the deposition venue. Nor did he attempt to resolve the matter with the SEC, either before or after his deposition. Instead, Stoecklein ignored numerous warnings about the consequences of his Fifth Amendment assertion and bypassed numerous opportunities to waive the privilege. As late as April 18, 1996, the SEC expressed willingness to halt work on its summary judgment motion and forgo a motion for preclusion if Stoecklein would sit for deposition. Stoecklein responded through counsel that he would "take his chances" with summary judgment. (Letter from SEC to Def. Atty of 4/27/96 (Vasilescu 1st Aff. Ex 4.))

### B. Untimely Request to Waive Privilege

Stoecklein's change of heart came six months after he invoked the Fifth Amendment and three months after the SEC moved for preclusion and summary judgment. During that period, neither Stoecklein nor his counsel thought it appropriate or necessary to reveal to the Court the true reason for Stoecklein's assertion of privilege. Stoecklein now claims that he remained silent, in part, because he did not want to bear the cost of applying for relief. (Hr'g Tr. at 3.)

That explanation, however, does not excuse Stoecklein's failure to request assistance through the simple, inexpensive expedient of a letter to the Court. Nor does it excuse defense counsel's failure to seek judicial intervention while standing before this Court during the case management conference on March 22, 1996—just six weeks after Stoecklein's deposition. At that time, it would have cost Stoecklein nothing to avail himself of the Court's assistance; yet neither Stoecklein nor his counsel offer any credible explanation for their failure to do so. Nor have they explained their continued silence while requesting several extensions of time to respond to the government's motions for preclusion and summary judgment.

In seeking to withdraw his improper assertion of privilege, Stoecklein relies heavily on *SEC v. Graystone Nash, Inc.* 25 F.3d 187 (3d Cir.1994), in which the Third Circuit reversed a preclusion order that flowed from an assertion of the Fifth Amendment during deposition. (*See* Def.Summ.J.Mem. of 8/9/96 (hereinafter "Def. 1st Mem.")) I find that Stoecklein's reliance on *Graystone Nash* is misplaced.

In *Graystone Nash*, the defendants properly invoked their Fifth Amendment privilege as a shield against self incrimination—unlike Stoecklein, who makes no claim that he declined to answer deposition questions for fear of criminal prosecution. In *Graystone Nash* the defendants appeared *pro se,* hence were not charged with knowledge of the consequences of asserting privilege—unlike Stoecklein, whose counsel advised him prior to deposition that financial difficulty was not a valid ground for invoking the Fifth Amendment (Hr'g Tr. at 3.) In *Graystone Nash,* the SEC's motion for preclusion gave the defendants their first notice that their assertion of privilege might be costly to their defense—unlike Stoecklein, who received ample warning that his repeated refusals to waive privilege would trigger motions for preclusion and summary judgment. In *Graystone Nash,* the court found an inadequate showing of unfair prejudice to the SEC—unlike this case, in which there is abundant prejudice to justify an order of preclusion.

### C. *Prejudice*

The Court is allowed to presume that the government has been unfairly prejudiced in cases such as this, where a defendant exhibits a history of obstructing discovery. *Certain Real Property*, 55 F.3d at 86. Stoecklein's six-month refusal to withdraw his assertion of privilege, coupled with his failure to seek an accommodation from the Court, his unwillingness to divulge the true reason for his assertion of privilege, and the eleventh-hour timing of his attempted waiver, compel a finding that Stoecklein has deliberately attempted to delay the adjudication of this case. Stoecklein simply may not invoke his privilege against self-incrimination to impede the government's discovery efforts and then seek to waive the privilege when faced with the consequences of his refusal to testify. *See United States v. St. Pierre*, 132 F.2d 837, 840 (2d Cir.1942) (requiring that a decision to waive or invoke the Fifth Amendment must be made when the litigant is first faced with the request to divulge privileged information), *cert. dismissed*, 319 U.S. 41, 63 S.Ct. 910, 87 L.Ed. 1199 (1943). By asserting and waiving privilege when convenient, Stoecklein has engaged in the type of conduct that the Second Circuit described as "a manipulative 'cat and mouse' approach to the litigation"—the type of conduct that warrants barring a defendant's testimony in opposition to summary judgment. *Certain Real Property*, 55 F.3d at 85.

The government also has suffered actual prejudice to its effort to police the securities markets and protect the investing public. Because the SEC seeks an officer and director bar, and because Stoecklein appears to be a current officer and director of a public corporation, each day that he manipulatively delays the resolution of this litigation potentially subjects the public to enormous risk and creates inherent prejudice in this case. Allowing Stoecklein to withdraw his assertion of privilege would only prolong that prejudice. Stoecklein's improper delaying tactics have further prejudiced the government by putting the SEC to enormous and unnecessary expense. His inappropriate and unwarranted assertion of privilege forced the SEC to bear the cost of a pointless deposition. Moreover, his subsequent refusals to waive privilege caused the SEC to bear the additional cost of a motion for preclusion. Absent preclusion, Stoecklein's dilatory tactics would provide him an unfair strategic advantage in this litigation, allowing him to effectively ambush the SEC with evidence, defenses, and denials that he concealed until after the government moved for summary judgment.

Stoecklein argues that the government will not suffer prejudice because the SEC questioned him during its investigation prior to this litigation. That argument is unsupported by fact or law. Courts have avoided giving administrative inquiries preclusive effect because that would transform those inquiries into discovery or trials. *See SEC v. Saul*, 133 F.R.D. 115, 118 (N.D.Ill.1990) ("[T]here is no authority which suggests that it is appropriate to limit the SEC's right to take discovery based upon the extent of its previous investigation into the facts underlying its case. ....."); *cf. Hannah v. Larche*, 363 U.S. 420, 446, 80 S.Ct. 1502, 1516–17, 4 L.Ed.2d 1307 (1960) (refusing to grant preclusive effect to an investigation by the Federal Trade Commission because doing so would convert the investigation into a trial).

Contrary to Stoecklein's assertions, his May 1994 investigatory examination was not comprehensive; it did not, and could not, cover the same breadth of material as his subsequent deposition. During the May 1994 investigatory interview, the SEC could not discover Stoecklein's defenses and denials to the allegations in this litigation because the complaint had not yet been filed. During the May 1994 investigatory interview, the SEC could not inquire about much of Stoecklein's conduct as president of.Softpoint because he retained his position for more than one year after the interview. The scope of the May 1994 investigatory interview also was limited by Softpoint's failure to produce numerous significant documents until Autumn 1995, after Stoecklein had been replaced by new and more cooperative management. (Vasilescu 2d Aff. ¶ 32.) Consequently, Stoecklein's May 1994 testimony did

not address many of the significant issues in this case.

Both parties agree that the May 1994 inquiry did not cover (1) Stoecklein's role in preparing Softpoint's 1994 Form 10–K, (2) his involvement in preparing Softpoint's 1992, 1993, and 1994 tax returns, (3) Softpoint's inability to ship the requisite copyright protection hardware that accompanied all of its *bona fide* software sales, and (4) the circumstances surrounding Stoecklein's resignation from Softpoint. (Pl.Post–Arg.Mem. of 10/25/96 at 8–10; Def.Post–Arg.Mem. of 11/5/96 at 6.) Moreover, the then-incomplete document production restricted the SEC's ability to question Stoecklein in May 1994 about (1) his role in preparing Softpoint's Form S–8 registration statements and the 1992 and 1993 Forms 10–K and 10–Q, (2) his knowledge and participation in the sale of Softpoint stock issued to foreign distributors, and (3) his knowledge of who owned the foreign distributors that received Softpoint stock. (*Compare* Inv.Tr. (Zucker Aff.Ex. 3) with Stoecklein Dep. (Zucker Aff.Ex. 4.))

The SEC also was unable to question Stoecklein about a 1993 Remington invoice to Softpoint because Stoecklein did not produce the document until September 1996—four months after the government moved for summary judgment and one month after Stoecklein submitted his responsive papers to the instant motions. (Remington Invoice of 10/27/93 (hereinafter "Remington invoice") (Stoecklein Supp. Aff. of 9/11/96 (hereinafter "Stoecklein 2d Aff.") Ex. 1.)) The Remington invoice clearly falls within the category of documents requested by the SEC in October 1995. (Pl.Doc.Req. of 10/30/95 (Vasilescu 2d Aff.Ex. 8)). Although Stoecklein claims timely production, the government has very adequately shown that the Remington invoice was not included in any of Stoecklein's or Softpoint's earlier document productions, and the circumstances of its production give rise to strong doubts about its authenticity. *(See* SEC Letter to Court of 9/17/96 (hereinafter "SEC Letter."))

## D. *Remedies*

By his unwarranted assertion of privilege regarding basic aspects of the case, including his defenses and denials, Stoecklein has manipulatively obstructed the government's discovery and wrongfully delayed the adjudication of this case. The guidelines set forth by the Second Circuit in *Certain Real Property* make clear that it is appropriate for this Court to preclude Stoecklein from offering testimony in opposition to summary judgment (1) because his assertion of privilege was unwarranted by law, (2) because he abjured his obligation to seek judicial intervention regarding the location or timing of his deposition, (3) because he refused to disclose the true reason for his assertion of privilege, (4) because he manipulatively delayed his attempt to waive privilege until the eleventh hour, and (5) because his actions have severely prejudiced the plaintiff in this case. *See Certain Real Property*, 55 F.3d at 84–86 (discussing the types of conduct that justify preclusion of a litigant's testimony).

Although preclusion is appropriate where the Fifth Amendment privilege has been abused to obstruct the discovery process in the manner described above, I recognize that it is a harsh sanction, to be employed only when the court is sure of the impotence of less drastic remedies. *Certain Real Property*, 55 F.3d at 84–85. In this case, however, I am convinced that no lesser remedy will cure the prejudice caused by Stoecklein's conduct. Stoecklein has provided no firm commitment that he actually will submit to deposition should the Court accept his affidavits opposing summary judgment. His present bid to waive privilege is merely a conditional offer, contingent upon the existence of some vague confluence of undefined circumstances regarding the location of his deposition and his ability to afford counsel. (Hr'g Tr. at 4–5; Stoecklein 1st Aff. ¶ 4.) Moreover, the Court has received no assurance that Stoecklein's financial condition has improved such that he now can afford either to travel to New York for a deposition here, or fly his lawyer to Nevada for a deposition there.

Stoecklein's avowed financial difficulties also render lesser sanctions ineffective because he cannot afford to reimburse the government for its enormous and unnecessary expenses. *See Graystone Nash*, 25 F.3d at 194 (stating that reimbursement and other

remedial measures are appropriate to prevent undue prejudice where a litigant is permitted to withdraw an assertion of Fifth Amendment privilege).

Because Stoecklein's invocation of the Fifth Amendment was neither warranted by law, asserted in good faith, nor timely waived, and because it has prejudiced the plaintiff, I preclude the affidavits that Stoecklein has submitted in opposition to the motion for summary judgement. I also preclude the Remington invoice, pursuant to Fed.R.Civ.P. 37(c), because of its untimely production in a manner that appears calculated to ambush the plaintiff. Nonetheless, I accept the affidavits submitted by other individuals in opposition to the motion for summary judgment, because those individuals were not included in the Fifth Amendment invocation and could have been called or subpoenaed by the government at any time.

## II. *Summary Judgment*

While denying Stoecklein the unfair advantage of asserting evidence that he withheld during discovery, my preclusion order does not relieve the government of its burden of proof for summary judgment pursuant to Fed.R.Civ.P. 56. Accordingly, the SEC, as the moving party, bears the initial burden of showing "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Where a moving party meets that initial burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). In so doing, the opposing party "must do something more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ Stoecklein's burden is made more difficult by his disregard of Local Rule 3(g), which requires that a party opposing summary judgment submit a statement of disputed material facts. S.D.N.Y.Civ.R. 3(g). Stoecklein's non-compliance with Rule 3(g) compels the Court to accept as uncontroverted the material facts set forth in the government's Rule 3(g) statement of undisputed facts. *Id.; accord United States v. All Right, Title and Int. In Real Prop. and Appurtenances thereto known as 143–147 East 23rd St.,* 77 F.3d 648, 657 (2d Cir.) (stating that defendant's failure to submit a Rule 3(g) statement was deemed to be an admission of the facts set forth in the government's Rule 3(g) statement), *cert. denied,* —— U.S. ——, 117 S.Ct. 67, 136 L.Ed.2d 28 (1996); *see also* Pl. 3(g) Statement ¶¶ 1–325.

The SEC's motion for summary judgment is supported by a voluminous record. The Court has heard oral argument; reviewed several hundred exhibits; read more than 1,000 pages of depositions, sworn interviews, and affidavits; and studied the parties' numerous memoranda and other submissions. On the basis of that record, I find that the government has met its burden for summary judgment pursuant to Fed.R.Civ.P. 56, as set forth below.

### A. *Section 5 Securities Registration Violations*

■ Sections 5(a) and (c) of the Securities Act ("Section 5") prohibit "any person" from directly or indirectly using the mails or the means of interstate commerce to offer or sell a security unless it is registered with the SEC or is exempt from registration. 15 U.S.C. §§ 77e(a), (c). Liability arises when a principal in the sale of an unregistered security is either an issuer, an underwriter, or a necessary participant. *SEC v. Holschuh,* 694 F.2d 130, 137–39 (7th Cir.1982) (citing *SEC v. Culpepper,* 270 F.2d 241, 247 (2d Cir.1959); *SEC v. Chinese Consol. Benev. Assn,* 120 F.2d 738, 741 (2d Cir.), *cert. denied,* 314 U.S. 618, 62 S.Ct. 106, 86 L.Ed. 497 (1941)); *SEC v. Universal Major Indust. Corp.,* 546 F.2d 1044, 1046–47 (2d Cir.1976), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977). If a registration exemption is claimed, the claimant bears the burden of proving the exemption. *SEC v. Ralston Purina Co.,* 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953); *Byrnes v. Faulkner, Dawkins & Sullivan,* 550 F.2d 1303, 1311 (2d Cir.1977). Scienter is not an element of a Section 5

violation. *Universal Major Indust. Corp.,* 546 F.2d at 1047.

The record is undisputed that no registration statement was filed with the SEC for the 344,700 Softpoint shares issued to the foreign distributors and subsequently sold in the United States. It also is undisputed that those shares were not exempt from the SEC registration requirements.

■ The facts of this case show that Stoecklein was extensively involved in the sale of the unregistered stock. He helped prepare the marketing agreements that led to the issuance of Softpoint stock to the foreign distributors. He admitted contacting brokerage firms and helping liquidate the stock in the United States. He made the necessary arrangements with the broker-dealers and negotiated their compensation for selling the stock. He acted as intermediary between the broker-dealers and the foreign distributors whose stock was sold. He arranged to have his brother, D. Stoecklein, open brokerage accounts and sell a large portion of the stock. He was kept apprised of the broker-dealers' progress in selling the shares and remitting the proceeds. He facilitated at least a portion of Softpoint's $196,-000 in undisclosed payments to the brokerage firms. Stoecklein was involved at every stage of the stock liquidation scheme, hence his role in the sale of unregistered Softpoint securities was clearly necessary and substantial and not simply "de minimis." *See SEC v. Murphy,* 626 F.2d 633, 650–52 (9th Cir.1980) (requiring that liability for a Section 5 violation must be predicated upon substantial participation, and not de minimis activity.)

Having previously admitted his pivotal role in the stock liquidation scheme, Stoecklein cannot now recant. He is not only precluded from proffering a denial, but also is bound by his prior admissions even in the absence of a preclusion order. *Buttry v. General Signal Corp.* 68 F.3d 1488, 1493 (2d Cir.1995) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.") (quoting *Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987); *cf. SEC v. Research Automation Corp.* 585 F.2d 31, 34 n. 5 (2d Cir.1978)

("Sworn testimony taken in an SEC investigation may be used ... on a motion for summary judgment."). Moreover, Stoecklein does not fully recant; in his sworn statements opposing summary judgment, Stoecklein actually affirms a portion of his prior admission. (Stoecklein Supp. Aff of 9/11/96 (hereinafter "Stoecklein 2d Aff.") ¶¶ 8, 11, 14, 17 (confirming that he helped liquidate blocks of unregistered Softpoint stock.))

Furthermore, there is no merit to Stoecklein's argument that his lack of control over Softpoint's corporate policies absolves him of liability for his role in the stock liquidation. The prohibitions of Section 5 are not limited to control persons; the language of the statute sweeps broadly to encompass "any person" who participates in the offer or sale of an unregistered, non-exempt security. 15 U.S.C. §§ 77e(a), (c); *Chinese Consol. Benev. Ass'n,* 120 F.2d at 741 ("Section 5(a)(1) ... broadly prohibits sales of securities irrespective of the character of the person making them."). By his dealings with brokerage firms, Stoecklein was instrumental in opening the routes through which Softpoint's unregistered common stock flowed into the United States market. Such participation falls within the scope of Section 5. *See SEC v. North Am. Research and Dev. Corp.,* 424 F.2d 63, 71–72 (2d Cir.1970) (noting that any person "joining in the common effort" to sell unregistered shares is subject to "the injunctive and other powers of the SEC and the federal courts").

Notwithstanding Stoecklein's failure to expressly assert any exemption to the registration requirement, I have carefully considered the statutory exemptions in the Securities Act and the applicable SEC Rules, and I find that none applies to the Softpoint transactions. In reaching that conclusion, I have paid particular attention to a pair of exemptions that, at first blush, appear appropriate. Closer analysis, however, reveals that they are inapplicable to this case.

■ By professing to be a mere underling who did not control the issuance of stock, Stoecklein appears to invoke Section 4(1) of the Securities Act ("Section 4(1)"), which exempts from registration securities transac-

tions that do not involve an issuer, underwriter, or dealer. 15 U.S.C. § 77d(1). Stoecklein, however, does not qualify under Section 4(1) because its exemption applies only to the transaction itself, not to the individuals involved. *Holschuh,* 694 F.2d at 137–38; *accord Murphy,* 626 F.2d at 648; *United States v. Wolfson,* 405 F.2d 779 (2d Cir.1968), *cert. denied,* 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969); *SEC v. Netelkos,* 592 F.Supp. 906, 915 (S.D.N.Y.1984). Section 4(1) was created "to exempt only trading transactions between individual investors with respect to securities already issued;" it does not exempt "distributions by issuers or the acts of individuals who engage in steps necessary to such distributions." *Culpepper,* 270 F.2d at 247 (quoting *Chinese Consol. Benev. Ass'n,* 120 F.2d at 741); *see also Preliminary Note to SEC Rule 144,* 17 C.F.R. § 230.144. Thus, it is immaterial whether Stoecklein was an issuer; he does not qualify for the protection of Section 4(1) because his participation in the offer and sale of unregistered stock was part of a transaction by Softpoint, an entity that was, in fact, an issuer. *Holschuh,* 694 F.2d at 137–38; *Wolfson,* 405 F.2d at 782; *Culpepper,* 270 F.2d at 247; *Netelkos,* 592 F.Supp. at 915.

■ The Softpoint stock liquidation also fails to qualify for exemption under Regulation S, which provides a safe harbor from registration for offshore securities transactions. 17 C.F.R. §§ 230.901 *et seq.* Regulation S shelters only *bona* fide overseas transactions; it is not a haven for any foreign stock distribution that is part of a plan to evade the registration provisions of the Securities Act. *Id.* n. 2. Stoecklein's pre-litigation testimony revealed that Softpoint was not engaged in *bona fide* overseas transactions. By disclosing that Softpoint's domestic stock liquidation plan predated its foreign distributions, Stoecklein exposed those distributions as a preconceived artifice—designed to cloak the sale of unregistered securities in the United States. (Inv.Tr. at 40–42, 45, 67–69, 91.) Consequently, the Softpoint stock liquidation scheme fails to qualify for the safe harbor exemption under Regulation S.

■ It is obvious from the record that Stoecklein's participation in the stock liqui-

dation implicated the use of the mails and the facilities of interstate commerce. This prerequisite of a Section 5 violation is broadly construed to include tangential mailings or intrastate telephone calls. *See Wolfson,* 405 F.2d at 783–84 (construing Section 5(a)(1) to prohibit use of the mails to send stock offers, to transmit sales literature, to ship securities certificates after sale, to remit the proceeds to the seller, to send buyers' confirmation slips, and to effect more tangential communications) (citing *United States v. Kane,* 243 F.Supp. 746, 750 (S.D.N.Y.1965); *SEC v. Hasho,* 784 F.Supp. 1059, 1106 (S.D.N.Y. 1992) (ruling that telephone sales calls to securities customers were sufficient to implicate the prohibition of Section 5(a)(1)); *Lennerth v. Mendenhall,* 234 F.Supp. 59, 63 (N.D.Ohio 1964) (holding that intrastate telephone calls were sufficient to implicate the Section 5(a)(1) prohibition because the "use of a telephone is the use of a means of interstate communication" regardless of the intrastate character of the call). Accordingly, the Section 5 jurisdictional requirement is amply satisfied by Stoecklein's telephone communications with various brokerage firms; by the wire or mail transfers of funds among Softpoint, the brokerage firms, and various banks; and by the facsimile transmissions to Stoecklein, reporting on the progress of the stock sales and the distribution of the proceeds.

## B. *Section 17(a), Section 10(b), Rule 10b–5 Anti–Fraud Violations*

Section 17(a) of the Securities Act ("Section 17(a)") is a general prohibition against fraud in the offer or sale of securities, using the mails or the instruments of interstate commerce. 15 U.S.C. § 77q(a). Section 17(a)(1) forbids the direct or indirect use of any device, scheme, or artifice to defraud; Section 17(a)(2) makes it unlawful to obtain money or property through misstatements or omissions about material facts; and Section 17(a)(3) proscribes any transaction or course of business that operates as a fraud or deceit upon a securities buyer. 15 U.S.C. § 77q(a)(1)–(3).

■ The three categories of misconduct in Section 17(a) do not have uniform culpabil-

ity requirements. Scienter is a necessary element of a Section 17(a)(1) violation; scienter is not an element of a violation of Sections 17(a)(2) or (3). *Aaron v. SEC*, 446 U.S. 680, 697, 100 S.Ct. 1945, 1956, 64 L.Ed.2d 611 (1980).

Section 17(a) has been broadly construed to encompass a wide range of conduct. *See, e.g., SEC v. Benson*, 657 F.Supp. 1122, 1130 (S.D.N.Y.1987) (ruling that omissions and misstatements about a corporation's income in securities registration statements violated Section 17(a)); *SEC v. Bangor Punta Corp.*. 331 F.Supp. 1154, 1160–61 (S.D.N.Y.1971) (ruling that omission of just one material fact in a securities registration statement violated Section 17(a)), *modified sub nom. Chris–Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 232, 38 L.Ed.2d 148 (1973).

■ Section 10(b) of the Exchange Act ("Section 10(b)") prohibits the direct or indirect employment of manipulative and deceptive devices in connection with the purchase or sale of securities, using the mails, instruments of interstate commerce, or any facility of a national securities exchange. 15 U.S.C. § 78j(b). Section 10(b) is enforced through SEC Rule 10b–5 ("Rule 10b–5"), which prohibits the use of any device, scheme, or artifice to defraud; any untrue statement or omission of material fact; and any act, practice, or course of business that operates as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R § 240.10b–5. Scienter is an element of a violation of Section 10(b) and Rule 10b–5. *Aaron*, 446 U.S. at 691, 100 S.Ct. at 1952–53.

■ Section 10(b) and Rule 10b–5 have "always been acknowledged as catch-alls" to prevent manipulation and misrepresentation. *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 859 (2d Cir.1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Thus, courts have liberally construed the requirement that violative conduct must occur "in connection with" the purchase or sale of a security. *Superintendent of Ins. of N.Y. v. Bankers Life and Cas. Co.* 404 U.S. 6, 12, 92 S.Ct. 165, 168–69, 30 L.Ed.2d 128 (1971) ("Section 10(b) must be read flexibly, not technically and restrictively."); *Texas Gulf Sulphur Co.* 401 F.2d at 860 (finding that the phrase "in connection with" allows Section 10(b) and Rule 10b–5 to reach any device on which a reasonable investor would rely). Section 10(b) and Rule 10b–5 liability can flow from "misstatements and omissions in press releases, news articles, and quarterly and annual public filings." *In re Ames Dep't Stores, Inc. Stock Litig.*, 991 F.2d 953, 962 (2d Cir.1993). Rule 10b–5 also imposes liability for insider trading. *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), *construed in Dirks v. SEC*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *see also United States v. Teicher*, 987 F.2d 112 (2d Cir.) (dictum) (suggesting that Rule 10b–5 imposes liability for insider trading without regard to whether the inside information is the actual cause of the purchase or sale of the securities), *cert. denied*, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993).

■ Stoecklein's activities fall unmistakably within the broad scope of conduct prohibited by Sections 17(a) and 10(b) and Rule 10b–5 (collectively the "anti-fraud provisions"). As a consultant to Softpoint, Stoecklein helped prepare and disseminate an array of press releases, Form 10–K annual reports, Form 10–Q quarterly reports, and Form S–8 registration statements, containing material misrepresentations and omissions about Softpoint's finances. As president of Softpoint, Stoecklein signed additional public filings containing material misrepresentations and omissions about Softpoint's financial status. He also participated in schemes to inflate Softpoint's income (1) by the unlawful sale of unregistered common stock in the United States and (2) by the sale of stock that had been spuriously registered as a consultant's fee payment to defaulted defendant Lane, pursuant to an employee stock compensation plan. Coincident with his activities on behalf of Softpoint, Stoecklein enriched himself through insider trading in Softpoint common stock.

■ Softpoint's press releases and quarterly and annual reports were unquestionably the type of documents upon which

an investor would have relied in deciding whether to purchase Softpoint stock, hence they satisfy the "in connection with" requirement of Section 10(b) and Rule 10b–5. *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (allowing a cause of action under Section 10 and Rule 10b–5 for misrepresentations in press releases); *Ross v. A.H. Robins Co.,* 607 F.2d 545, 548–49 (2d Cir.1979) (allowing Section 10(b) and Rule 10b–5 liability to be premised upon material omissions in press releases and Form 10–K annual reports), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). Softpoint's Form S–8 registration statements were more closely linked to the offer and sale of Softpoint stock, hence they fall within the scope of Sections 17(a)(2) and (3), as well as Section 10(b) and Rule 10b–5. *Benson,* 657 F.Supp. at 1130–31; *Bangor Punta Corp.,* 331 F.Supp. at 1160.

Softpoint's stock liquidation scheme was directly related to the offer and sale of securities. By facilitating the sale of unregistered shares, Stoecklein engaged in a course of business that deceived purchasers as to the legality of the stock issue and the financial stability of their investment. Thus, Stoecklein's activities in the liquidation scheme fall within the scope of Section 17(a)(3), as well as Section 10(b) and Rule 10b–5.

 The misstatements and omissions contained in Softpoint's public filings and press releases were material within the meaning of Sections 17(a)(2) and 10(b) and Rule 10b–5. The test of materiality is whether a reasonable investor would consider the information significant. *Basic, Inc.* 485 U.S. at 231–32, 108 S.Ct. at 983–84 (defining materiality as a substantial likelihood that a reasonable investor would consider the information important in making an investment decision) (citing *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

Softpoint's omissions and misrepresentations certainly concerned information of indisputable importance to a reasonable investor. By touting the $4.41 million in fictitious software sales as legitimate income, Stoecklein's array of press releases and public fil-

ings overstated Softpoint's 1992 and 1993 sales revenues by a total of 338 percent. The press releases and public filings failed to disclose the true nature of Softpoint's relationship with the foreign distributors. The press releases and public filings misrepresented the proceeds from stock liquidation as *bona fide* sales revenue. Softpoint's Form S–8 registrations misrepresented the stock issued to defaulted defendant Lane as a consultant's fee, when, in actuality, proceeds from the shares were funnelled back to Softpoint and remitted to Stoecklein. Softpoint's 1994 Form 10–K falsely stated that Softpoint's corporate charter had been amended to authorize 125,000 shares of preferred stock, which were issued for $1.25 million in media credits. Such information is unquestionably material to a reasonable investor. *See San Leandro Emerg. Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 810 (2d Cir.1996) ("[M]aterial facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities.") (quoting *Texas Gulf Sulphur Co.,* 401 F.2d at 849).

Softpoint's $196,000 in payments to the brokerage firms were likewise omitted from the press releases and SEC filings. Those payments also were material information. *See SEC v. Scott,* 565 F.Supp. 1513, 1527 (S.D.N.Y.1983) (stating that an apparent kickback agreement between an issuer and an underwriter is material because it "raises an inherent conflict of interest"), *aff'd sub nom. SEC v. Cayman Islands Reinsurance Corp.,* 734 F.2d 118 (2d Cir.1984).

 Stoecklein also violated Rule 10b–5 by trading in Softpoint stock while in possession of material, non-public information about Softpoint. Liability for insider trading arises where a corporate insider, with a fiduciary duty to shareholders, buys or sells securities on the basis of undisclosed corporate information. *Dirks,* 463 U.S. at 654–55 & n. 14, 103 S.Ct. at 3262 & n. 14 (citing *Chiarella,* 445 U.S. at 232–33, 100 S.Ct. at 1116–17). In late 1993, Stoecklein and his company, Remington, sold 70,000 shares of Softpoint

common stock while Stoecklein continued working as a consultant to Softpoint. As a corporate insider, Stoecklein had legitimate access to corporate secrets and thus owed a fiduciary duty to shareholders. *Dirks,* 463 U.S. at 655 n. 14, 103 S.Ct. at 3262 n. 14 ("[Where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant working for the corporation, these outsiders may become fiduciaries of the shareholders.]"). Consequently, Stoecklein had an obligation either to disclose his non-public information or to refrain from trading. By doing neither, he violated the proscription against insider trading. *Chiarella,* 445 U.S. at 231, 100 S.Ct. at 1116; *accord Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228, 237 (2nd Cir.1974) ("[O]ur 'disclose or abstain' rule applies whether the securities are traded on a public stock exchange or sold through private placement.") (construing *Texas Gulf Sulphur,* 401 F.2d at 848).

 It is manifest from the record that Stoecklein acted with scienter, thus justifying assessment of liability under Sections 17(a)(1) and 10(b) and Rule 10b–5. *Aaron,* 446 U.S. at 686 n. 5, 100 S.Ct. at 1950 n. 5 (defining scienter as "a mental state embracing intent to deceive, manipulate, or defraud") (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976)). In reaching this conclusion, I have considered only those violations caused by Stoecklein's knowing misconduct, and not those caused by his recklessness.[10]

Stoecklein admitted that he knew that proceeds from the sale of Softpoint stock were recorded as payments on accounts receivable, and he knew that Softpoint's press releases and public filings not only failed to reveal that fact, but also affirmatively portrayed the payments as legitimate sales revenue. Stoecklein also knew that Softpoint had paid large sums of money to the brokerage firms in connection with the unlawful stock liquidation, and he knew that Softpoint's press releases and public filings failed to reveal that fact. Nonetheless, Stoecklein continued to participate in the subterfuges for three years. (Pl.3(g) Statement ¶¶ 11–12.)

Faced with such indisputable evidence of Stoecklein's culpability, I am unable to credit his assertion that he lacked the requisite scienter to be held liable under Sections 17(a)(1) and 10(b) and 10b–5. Stoecklein claims that he is not culpable for his conduct as a consultant to Softpoint because (1) he was not a control person and (2) he had no knowledge of wrongdoing at the time of the offenses. (Def 1st Mem. at 13–14.) He portrays himself as a mere scrivener who performed ministerial tasks at the direction of his superiors—in particular, Softpoint's then-president Cosby. (Stoecklein 1st Aff. ¶¶ 6–8, 11–25.) Stoecklein also denies culpability for his actions as president of Softpoint, on the grounds that he relied on Softpoint's auditor, Midgley, and also was misled by other Softpoint executives. (Def. 1st Mem. at 14–15; Stoecklein 1st Aff. ¶¶ 26–28.)

Stoecklein's belated denial is insufficient to overcome the overwhelming evidence that he acted with the requisite scienter. Even if he did not know the precise details of the fictitious software sales and the related stock sale scheme, Stoecklein knew that the press releases and public filings that he prepared were inaccurate and omitted material information. As an experienced businessman and an expert on SEC disclosure statements, Stoecklein cannot escape liability "by closing his eyes to what he saw and could readily understand." *SEC v. Frank,* 388 F.2d 486, 489 (2d Cir.1968). The same logic applies to Stoecklein's later activities as president and a director of Softpoint. He signed Softpoint's 1994 Form 10–K disclosure statement and its 1994 federal tax return even though they did

---

**10.** Both *Aaron* and *Hochfelder* reserved the question of whether recklessness satisfies the scienter requirement of Section 10(b) and Rule 10b–5. 446 U.S. at 686 n. 5, 100 S.Ct. at 1950 n. 5. *In Rolf v. Blyth, Eastman Dillon & Co.,* the Second Circuit considered the issue in the context of a private right of action, rather than an SEC enforcement action, and held that recklessness does satisfy the scienter requirement where an aider and abettor owes a fiduciary duty to the defrauded party. 570 F.2d 38, 44 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). *Rolf,* however, reserved the question of whether the recklessness standard applies in the absence of a duty of disclosure and loyalty to the defrauded party. *Id.* at n. 9.

not match; the Form 10–K included the fictitious software sales, while the tax return did not. Thus, Stoecklein filed two financial disclosures with full knowledge that one of them materially misrepresented Softpoint's true financial condition.

■ There is no merit to Stoecklein's proffered defense that he relied on Softpoint's auditor, Midgley, to insure the accuracy of Softpoint's SEC disclosures. As a director of a public corporation, Stoecklein had a well-defined obligation to ensure the accuracy of the information filed with the SEC. *SEC v. Bonastia,* 614 F.2d 908, 914 (3d Cir. 1980) (rejecting a defense of good faith reliance where the defendant was a high-ranking corporate officer who acted with scienter); *accord SEC v. Goldfield Deep Mines Co.* of Nev., 758 F.2d 459, 467 (9th Cir.1985) ("If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance.") (quoting *United States v. Erickson,* 601 F.2d 296, 305 (7th Cir.), *cert. denied* 444 U.S. 979, 100 S.Ct. 480, 481, 62 L.Ed.2d 406 (1979)); *SEC v. McNulty,* No. 94 Civ. 7114, 1996 WL 422259, at *7 (S.D.N.Y. July 29, 1996) (holding a businessman responsible for the accuracy of an SEC quarterly report that he signed, even though it was prepared by an accountant); *cf. SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082 (2d Cir.1972) (rejecting defendants' claim of good-faith reliance on counsel as a defense to liability for violating the securities laws).

Stoecklein's culpability is confirmed by the duration of his participation in Softpoint's various financial manipulations. See *Bankers Life and Cas. Co,* 404 U.S. at 10, 92 S.Ct. at 167–68 (noting that Rule 10b–5 liability is not limited to isolated acts, but also may be predicated on a fraudulent course of business that creates an illusion of prosperity and false expectations). The record proves that Stoecklein engaged in a three-year course of conduct—from the time the schemes began unfolding in 1992 until his forced resignation from Softpoint in 1995. It would strain credulity to believe that he remained oblivious to all that transpired around him during that period. Consequently, the SEC has more than met its burden of proving that it is beyond any genuine dispute that Stoecklein acted with the requisite scienter to assess liability for fraud and deception pursuant to Sections 17(a)(1) and 10(b) and Rule 10b–5.

■ Scienter is not a prerequisite of several of Stoecklein's violations because they fall clearly within the scope of Section 17(a)(2) and (3), as well as Section 10(b) and Rule 10b–5. Those violations include Stoecklein's preparation of materially misleading Form S–8 registration statements and his participation in the sale of unregistered stock.

■ Stoecklein's participation in the various schemes implicates the use of the mails and the facilities of interstate commerce in the same manner as his participation in the Softpoint stock liquidation. The jurisdictional requirements of Sections 17(a) and 10(b) and Rule 10b–5 are broadly construed, so as to be satisfied by any activity connected with a national securities exchange, by intrastate telephone calls, and by even the most ancillary mailings. *See, e.g., Franklin Savings Bank of N.Y. v. Levy,* 551 F.2d 521, 524 (2d Cir.1977) ("The use of the mails need not be central to the fraudulent scheme and may be entirely incidental to it."); *Loveridge v. Dreagoux,* 678 F.2d 870, 874 (10th Cir.1982) (predicating Rule 10b–5 jurisdiction on intrastate telephone calls). Stoecklein's press releases and public filings were conveyed by mail or wire. So too were the proceeds from the sale of his own Softpoint shares. The jurisdictional requirement of Section 10(b) and Rule 10b–5 is further satisfied by the fact that Stoecklein sold his shares while Softpoint stock was trading on the Boston Stock Exchange.

### C. *Rule 13b2–1 Falsified Accounting Records*

■ Rule 13b2–1 provides that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account" that a company is required to maintain under the Securities Exchange Act. 17 C.F.R § 240.13b2–1. The proscription is not

limited to corporate officers or employees. *Promotion of Reliability of Financial Information,* Exchange Act Release No. 34,15570, 1979 WL 17892(SEC), at *10. (Feb. 15, 1979) (Pl.Post–Arg.Mem.App.A.) There is no scienter requirement; liability is predicated on "standards of reasonableness." *Id.*

 As president of Softpoint, Stoecklein was responsible for the accuracy of Softpoint's books and records. By deciding to retain fictitious entries and payments in Softpoint's accounts receivable ledger, he acted neither reasonably nor in conformity with Generally Accepted Accounting Principles. Stoecklein also approved and signed the 1994 annual disclosure that misrepresented Softpoint's sales and collections. Moreover, Stoecklein admitted that, as a consultant, he participated in the preparation of numerous annual and quarterly reports containing the fictitious entries and payments. None of those activities met the standards of reasonableness required by Rule 13b2–1.

In sum, the government has more than met its burden for summary judgment pursuant to Fed.R.Civ.P. 56. Although Stoecklein is precluded from introducing evidence that he withheld from discovery, he is not barred from coming forward with arguments or witnesses to rebut the government's claims. This he has failed to do. Stoecklein has not fulfilled his Rule 3(g) obligation to submit a statement identifying any triable issues of fact. Moreover, the affidavits of his supporting witnesses consist of immaterial statements and unsupported opinions and conclusions that are insufficient to raise a genuine issue to be tried.

Stoecklein has submitted statements from five supporting witnesses. Affiant David Cosby ("D.Cosby"), a former Softpoint officer and director, and the son of co-defendant Robert Cosby, speculates that Stoecklein lacked knowledge of Softpoint's foreign business dealings, but D. Cosby offers no relevant testimony about Stoecklein's participation in Softpoint's various securities transactions and related activities. (D. Cosby Aff. of 8/6/96 (appended to Stoecklein 1st Aff.)) Affiant D. Stoecklein, the defendant's brother, opines about Stoecklein's culpability, based on hearsay evidence obtained from attendance at depositions, a review of deposition transcripts, and discussions with Softpoint officers. (D. Stoecklein Aff.) Affiant Terry Maxwell, a former Softpoint consultant, theorizes that Stoecklein would have tried to rectify any wrongdoing had he been aware of misconduct in Softpoint's overseas business dealings. (Maxwell Aff. of 8/7/96 (appended to Stoecklein 1st Aff.)) Affiant Loretta Adams, Stoecklein's former secretary at Softpoint, offers non-material statements that Stoecklein did not travel overseas, and she opines that Stoecklein lacked authority to sign Softpoint checks. (Adams Aff. of 8/7/96 (appended to Stoecklein 1st Aff.)) Co-defendant Cosby postulates that Stoecklein could not have reasonably concluded that Softpoint had engaged in any wrongdoing. (Cosby Decl. of 3/14/95 ¶¶ 10–11 (appended to Stoecklein 1st Aff.)) Although Cosby, claims responsibility for retaining fictitious software sales on Softpoint's books in 1993, his statement is not relevant to Stoecklein's decision to write down the fictitious receivables as bad debt in 1994. (*Contrast Id.* ¶ 9 with Midgley Dep. at 95–97.)

Stoecklein's own proffered testimony would be similarly insufficient, if not precluded, because it too consists of unsubstantiated allegations and conclusory denials. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. at 1355–56 (requiring the opponent of summary judgment to do more that raise "some metaphysical doubt as to the material facts"). Accordingly, I grant the government's motion for summary judgement as to Stoecklein's violations of Sections 5 and 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and SEC Rules 10b–5 and 13b2–1.

### D. *Remedies*

#### 1. *Permanent Injunction*

 The Securities Act and the Exchange Act both provide for injunctive relief when any of their provisions have been violated. *See* 15 U.S.C. §§ 77t(b), 78u(d). A defendant may be permanently enjoined from further violations of either act. *Id.* The Exchange Act also gives authority to permanently enjoin future service as an officer or

director of a public company. See 15 U.S.C. § 78u(d)(2). Injunctive relief is appropriate when there is a "realistic likelihood of recurrence" of the violations. *SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 99–100 (2d Cir.1978). Injunctive relief is permissible following summary judgment. *Research Automation Corp.*, 585 F.2d at 33. First offenders are not immune from injunctive relief *SEC v. Shapiro*, 494 F.2d 1301, 1308 (2d Cir.1974).

 The Second Circuit has articulated several factors to be considered in assessing the probability of future infractions: (1) the degree of scienter involved, (2) the isolated or recurring nature of the fraudulent activity, (3) the defendant's appreciation of his wrongdoing, and (4) the defendant's opportunities to commit future violations. *Commonwealth Chem. Secs., Inc.*, 574 F.2d at 100. Examination of these factors shows that, without restraint, there is a realistic likelihood that Stoecklein's infractions would recur.

The record shows a high degree of culpability. Stoecklein participated in the fraudulent schemes despite his awareness of Softpoint's deceptive public disclosures. He helped prepare false reports, registrations, and press releases; signed and filed false reports with the SEC; engaged in insider trading; and participated in falsifying corporate financial records. Stoecklein's fraudulent behavior was not limited to a single, isolated incident. He engaged in a three-year course of conduct, entailing repeated and diverse violations of the securities laws; yet he shows no appreciation of his misconduct. Stoecklein adamantly maintains that his involvement in Softpoint's financial manipulations was entirely legitimate or unknowing. He depicts himself as an unwitting participant in schemes concocted by Cosby and other Softpoint officers.

Absent restraint, Stoecklein's profession would give him numerous opportunities to commit future violations. He holds himself out as an expert on corporate capitalization and appears to be a current officer and director of a public corporation. Moreover, Stoecklein already has demonstrated that he is capable of engaging in future unlawful acts. He flouted the law by continuing his misconduct throughout the SEC's investigation of Softpoint. Moreover, by ordering fictitious receivables retained on Softpoint's books, he spurned an opportunity to rectify past infractions. Accordingly, I find that Stoecklein's long and continuing pattern of misconduct demonstrates a reasonable likelihood of recurrent violations, and I grant the SEC's request to permanently enjoin him from future violations of the securities laws and permanently bar him from serving as an officer or director of a public company.

### 2. *Disgorgement*

 Disgorgement of illicit profits is a proper equitable remedy for securities fraud. *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir.1995) (citing *Manor Nursing Ctrs., Inc.*, 458 F.2d at 1104). Disgorgement is not punitive; it is designed to deprive wrongdoers of the profits of their wrongdoing. *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir.1987), *cert. denied*, 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988). Thus, the proper measure of disgorgement is the amount of the wrongdoer's unjust enrichment *Commonwealth Chem. Secs., Inc.*, 574 F.2d at 102. In cases of insider trading, the disgorgement normally consists of the full profit derived from the tainted securities transactions. *SEC v. First City Financial Corp.*, 890 F.2d 1215, 1231 (D.C.Cir.1989). Where an exact computation is not possible, the wrongdoer bears any risk of uncertainty. *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir.1996).

 Stoecklein's illicit profits consist of $192,000 received from co-defendant Lane and $282,416 derived from the sale of 70,000 shares of Softpoint stock in October and November 1993. Stoecklein traded the stock jointly with his company, co-defendant Remington, which was ordered to disgorge the $282,416 and pay prejudgment interest of $61,155, pursuant to a final default judgment entered on June 11, 1996. Accordingly, Stoecklein must disgorge a total of $474,416, of which he is jointly and severally liable with Remington for the sum of $282,416. Stoecklein also is assessed prejudgment interest of $61,155, for which is jointly and severally liable with Remington. Stoecklein will be

individually liable for prejudgment interest to be computed on his illicit profit of $192,-000, received from co-defendant Lane.

### 3. *Civil Penalties*

The Securities Act and the Exchange Act both provide for civil penalties when any of their provisions have been violated. *See* 15 U.S.C. §§ 77t(d), 78u(d)(3). The penalties are established in three tiers, imposing escalating levies commensurate with the severity of the offenses. The third tier, for the most egregious violations, provides a civil penalty of $100,000 for individuals. The Exchange Act also allows imposition of an additional civil penalty in the amount of three times the profits derived from insider trading. 15 U.S.C. § 78u–1.

■■■ Because Stoecklein's conduct involved fraud, deceit, manipulation, and deliberate disregard of regulatory requirements, and because his conduct created a significant risk of substantial losses to others, Stoecklein's violations warrant imposition of the most severe civil penalty. *See* 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii); *see also* 15 U.S.C. § 78u(a)(2). Accordingly, Stoecklein is assessed a civil penalty of $100,000.

The Court is deeply troubled by the manner in which penalties have been sought by the SEC in this case. Co-defendant Cosby, whose conduct was equal to or more egregious than Stoecklein's, was assessed a civil penalty of $100,000 pursuant to a Default Order submitted by the SEC. (Cosby Default J. signed 8/23/96.) Similarly, co-defendant Lane, whose conduct was equal to or only slightly less egregious than Stoecklein's, also was assessed a civil penalty of $100,000 pursuant to a Default Order submitted by the SEC. (Lane Default J. filed 6/11/96.) The SEC, however, sought and obtained an order from this Court assessing against co-defendant Remington a civil penalty of $847,248, which is triple the amount that it profited, with Stoecklein, from insider trading. (Remington Default J. filed 6/11/96.) The Court believes this represents a fundamental inconsistency. Accordingly, the civil penalty assessed against Remington is reduced to $100,000.

### *CONCLUSION*

For the reasons set forth above, the SEC's motion for an order of preclusion is granted. The SEC's motion for summary judgment also is granted as to Stoecklein's violations of Section 5 and Section 17(a) of the Securities Act of 1933, and Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 and Rule 13b2–1 thereunder. Stoecklein is permanently enjoined from violating Section 5 and Section 17(a) of the Securities Act of 1933, and Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 and Rule 13b2–1 thereunder. Stoecklein is permanently barred from service as an officer or director of a public company. Stoecklein is ordered to disgorge $474,424, of which he is jointly and severally liable with co-defendant Remington for $282,416. Stoecklein is ordered to pay a civil penalty in the amount of $100,000. Stoecklein is assessed prejudgment interest of $61,155, for which he is jointly and severally liable with co-defendant Remington. Stoecklein will be individually liable for prejudgment interest to be computed on the sum of $192,000. The civil penalty assessed against co-defendant Remington is reduced to $100,000.

Within five business days of this order, plaintiff is directed to submit a proposed judgment order (1) barring Stoecklein from serving as an officer or director of a public company, (2) specifying, with the particularity required by law, the conduct from which Stoecklein will be permanently enjoined, (3) enumerating the amounts to be disgorged by Stoecklein and the prejudgment interest to be assessed, including a computation of prejudgment interest on $192,000 of the disgorgement, and (4) specifying the amounts for which Stoecklein is individually liable and those for which he is jointly and severally liable with Remington.

Within five business days of this order, plaintiff is further directed to submit a proposed order modifying the Remington Default Judgment of June 11, 1996, by reducing the civil penalty assessed against Remington to $100,000.

SO ORDERED.